## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

PLAINTIFF:  Alex Feinman,                                    DOCKET NO_____

             1267 Main St., Acushnet, MA          CIVIL ACTION  42 U.S.CA.   1983

          V

DEFENDANTS:
Dominic Nicolaci, Fairhaven, MA
Michelina Andrade, 233 Smith St., New Bedford, MA.
Christopher Baty, 1489 Morton Ave., New Bedford, MA
James Burgess, 731 Cumberland Hill Road, Woonsocket, RI
Attorney Stewart Grimes, 448 County St., New Bedford, MA
Chief of Police, New Bedford PoliceDepartment, New Bedford, MA
Sheriff, Bristol County Sheriff's Department, New Bedford, MA
Bonnie Demers, New Bedford, MA
Rosalie Hassey, Mattapoisett, MA
LFS, Incorporated, 195 Riverside Ave., New Bedford, MA
Chuck Prumier, Special Agent, FBI, 20 Riverside Dr., Lakeville, MA
Detective Christoper Richmond, Acushnet Police Department.
State Attorney  Chris Markey, New Bedford, MA
Attorney David Madoff, Boston, MA
Thomas Brunelle, 126 Wood St., New Bedford, MA
Bail Commissioners, John Doe (1) and John Doe (2), State of Massachusetts

**03 ─ 12301 GAO**

MAGISTRATE JUDGE *Bowler*

## COMPLAINT

### PARTIES
Detective Christopher Richmond, Acushnet Police
District Attorney Christopher Markey
Attorney David Grimes
Sheriff, Bristol County
Dominic Nicolaci
Rosalie Hassey
Thomas Brunelle
Michelina Andrade
Christopher Baty
James Burgess
FBI Agent, Chuck Prunier
Attorney David Madoff, Bankruptcy Trustee
LFS, Incorporated
New Bedford Police Chief
Bonnie Demers
Bail Commissioners, John Doe (1) and John Doe (2), State of Massachusetts

AMOUNT $.150
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. F.O.M
11/18/03

JURISDICTION

This case has jurisdiction in violations of federal law 42 U.S.C.A. 1983 and against state and federal officials as well as the diversity of the case where the financial amounts exceed over $75,000. One of the defendants, James Burgess, lives outside Massachusetts in the state of Rhode Island.

PRELIMINARY STATEMENT OF FACTS

1. Plaintiff will establish proof of violation of their civil rights by physical force, threats, intimidation and coercion. The above-named defendants conspired as a whole to remove Alex Feinman from the community as a free man by unlawful means. They performed overt acts of intimidating his wife and co-workers who were not in compliance with their actions. Each defendant individually played a part but some were more in control of the situation. Others were intimidated because threat of loss of their livelihood. Others will financially gain if they remove Mr. Feinman from said property and from the community.

FACTS

2. On October 26, 2003, while walking his dog near his residence, Mr. Feinman was arrested by detective Christopher Richmond of the Acushnet Police Department, Acushnet, Massachusetts at approximately 8:00 p.m. Before being taken to the police department, Mr. Feinman called his attorney with his wife and Detective Richmond present. Detective Richmond wrongfully stated that he didn't know what the warrant was

for. Mr. Feinman was cuffed and taken to the Acushnet Police Department by Detective Richmond. Mr. Feinman asked him if this was the case he was investigating back in May of 2003 regarding the GAP, close to six months before this date, and Detective Richmond seemed very nervous regarding the situation. Approximately ten minutes later, Detective Richmond said yes, the warrant was issued regarding the above GAP case. He stated Mr. Feinman's bail, according to the state's attorney, would be $3000. The officer who transported Mr. Feinman to the jail told Mr. Feinman he and other officers did not know this warrant was at the police station. At all times, Dectective Richmond wanted to create and control the warrant with said district attorney, Christopher Markey.

 3. The district attorney was Christopher Markey. Mr. Markey's brother is the attorney on one of Mr. Feinman's bankruptcy cases who is representing Clean Rentals, a creditor who Mr. Feinman owes a sizable amount of money to.

Detective Richmond made allegations in papers provided to the district attorney for arraignment that Mr. Feinman "walked away" from a federal lock-up, used aliases and had "borderline criminal complaints totaling tens of thousands of dollars over the past six months". Detective Richmond acting under the colors of the law failed to investigate this case thoroughly and bring prosecution immediately upon his finding and not to wait for selective prosecution. If Mr. Feinman was such a threat to the community or had a history of running away, why the delay?

 4. Detective Richmond should have told the court that Mr. Feinman sent a letter to the

-3-

chief of police and to the town selectmen stating that his companies, L. Feinman & Sons and Acushnet Facility Maintenance, were in bankruptcy and he was relocating the offices to 195 Riverside Avenue, New Bedford, Massachusetts with the same phone number being forwarded.

5. Detective Richmond neglected to state that Mr. Feinman has been very active in the community with the Acushnet Animal Gift Fund, that 1267 Main Street is his residence and his former offices were in the back of his house. Detective Richmond also neglected to mention that when Mr. Feinman walked away from a federal camp it was because his life was threatened and he was to testify on behalf of the federal government on prison corruption and Mr. Feinman was relocated to another federal prison. He also neglected to state that when Mr. Feinman had a federal parole violation in in early 1990's, he self surrendered to another federal prison camp. The alleged aliases that Detective Richmond stated Mr. Feinman used previously is a complete falsehood. Mr. Feinman never skipped bail or missed a court date. As a matter of fact, Mr. Feinman was working in conjunction with the federal government in the 1970's.

6. It is true that Mr. Feinman has family in the Philadelphia area but he owns a home in Acushnet with his wife where they reside. Mr. Feinman has lived in Massachusetts for seven years and has very strong ties to the community.

7. Detective Richmond and prosecutor Markey, on 10/21/03, were looking for anyone to press charges against Mr. Feinman. They contacted Bill Tessier of the GAP Corporation on 10/21/03 and asked him if he was still interested in pursuing criminal charges. Why

-4-

then and not back in May?

8. On Friday, October 24, 2003, attorney Stewart Grimes, who is the attorney for a company by the name of LFS, Incorporated, whose principle officers are Michelina Andrade and Chrostopher Baty and whose other participants are Thomas Brunelle, James Burgess, Bonnie Demers, and others unknown to Mr. Feinman, held a meeting of the board of directors of LFS, Incorporated to vote Mr. Feinman out of the corporation as a consultant, employee or owner of said corporation. At this same meeting, they dismissed Attorney Donald Barnes as their attorney.

9. It is Mr. Feinman's belief that one of the parties or the attorney contacted Detective Richmond or the district attorney, Chris Markey, and schemed with them for their plans from removing Mr. Feinman from said company and premises and to enhance their scheme and had Mr. Feinman arrested and placed on an outrageous amount of bail of $100,000 regarding the GAP Corporation case which was a dispute of $3000. This GAP case was taken to small claims by Mr. Feinman on behalf of his companies and Mr. Feinman has proof that the Gap Corporation and the vendor management corporation who represents the GAP owed his companies, at that time, in excess of $12,000. Mr. Feinman, at the time of the small claims hearing with the GAP and their vendor management corporation, all agreed that since the bankruptcy was filed at the same time of the small claims hearing, all issues would be dealt with in the bankruptcy case. Detective Richmond was informed of this because Mr. Feinman stopped him when he was on road duty in the community to inform him. If Detective Richmond claimed bail was $3000, what was the cause of action for the bail commissioner to set at $100,000?

10. In this scheme, district attorney Markey read the same internet literature to the court that Christopher Baty and others from LFS, Incorporated mailed or faxed to approximately 250 individuals who were either vendors or customers of Mr. Feinman.

11. Mr. Feinman's attorney, Donald Barnes, asked District Attorney Markey to not attend the bail hearing because there was a conflict of interest because of the relationship Mr. Markey had with his brother who was the attorney for Clean Rentals. Mr. Markey refused. He was the state prosecutor at the bail hearing and arraignment.

12. On October 27, 2003 attorney Grimes on behalf of LFS, Incorporated issued no-trespassing orders to Mr. Feinman, Mr. James Maurice and Mr. Ryan Burke who were also associates of LFS, Incorporated. The no-trespass order was served on Mr. Feinman while he was in custody at the Bristol County Sheriff's Department.

13. The Bristol County Sheriff's Department, Detective Richmond, and the state's attorney, Mr. Markey, knew that Mr. Feinman was on heavy doses of prescribed pain medication due to a chronic hip disorder. The medication prescribed to Mr. Feinman is Methadone issued by Dr. Joseph Audette at the Spaulding Hospital in Boston, Massachusetts. Mr. Feinman asked Detective Richmond if he could take his medication with him and Detective Richmond refused. Mr. Feinman requested medication from the sheriff's department and they refused. They told Mr. Feinman and his wife they would not dispense that type of medication. They told Mrs. Feinman her husband had been treated with medication when she telephone them and this was not true.

When Mr. Feinman was taken to the courthouse, he screamed in agony, he was urinating and vomiting at the same time from major pain and withdrawal symptoms. Mr. Feinman's

-6-

attorney, Donald Barnes, addressed the court with the issue. The court refused to answer.
Mr. Feinman was taken from the courtroom back to the prison and put in a holding cell
with no treatment except a steel bench.

The sheriff's department and the Massachusetts district court judge, David Turcotte, as
well as the state prosecutor knew of Mr. Feinman's medical situation and knew that
mentally in this condition Mr. Feinman would not be able to help in my defense. The
prison also knew that I was sick and they allowed the constable to serve the no-trespass
order on me from LFS, Inc. In my belief, it is an obligation of the justice who heard my
pleas for help in the courtroom to protect my rights to medical treatment and not be
allowed to go through terrible withdrawal and pain without being under the care of
medical doctor. The sheriff's department laughed at Mr. Feinman in the holding cell and
treated him like a diseased animal. They constantly lied to Mr. Feinman saying they would
get his medication.

14. To further the scheme, LFS, Inc. officers Michelina Andrade, Thomas Brunelle,
James Burgess and Christopher Baty conspired to call the clerk magistrate and tell them
that the bail money for Mr. Feinman was stolen to hinder his release from custody. They
knew of Mr. Feinman's outcries in court because of severe pain and withdrawal
symptoms. The above individuals conspired in their overall plan for control of LFS and
the location of the company where Mr. Feinman had his papers and equipment stored at
195 Riverside Avenue, New Bedford, Mass. Why did the bail commissioner refuse the
$10,000 on Monday, October 27, 2003?

-7-

15. On Tuesday, October 28, 2003, Mrs. Feinman went to the offices where Alex

Feinman and LFS had their offices. S. Caras Restoration also has space in this building as

well. The building occupies 27,000 feet. She was screamed at and assaulted by Michelina

Andrade, Thomas Brunelle, Christopher Baty who spit in her face and told her to get out

of his building. When Mrs. Feinman was leaving she was pushed out the door by

Christopher Baty. When Mrs. Feinman was going to the courthouse with the bail money

to get her husband out of jail, Thomas Brunelle, Christopher Baty, James Burgess and

Michelina Andrade and others unknown went to the Mr. Feinman's residence to retrieve a

company car in the name of LFS. This car was behind a locked fence. When they went to

the property, they knew what they were doing. They breached the relationship with the

Feinman's and entered their property without permission by going into the house to

retrieve the keys and other valuables. Mr. Feinman's handicap plaque card issued by the

state was in the car at they time they took it, breaking and entering to further their scheme.

It is Mr. Feinman's belief that said individuals from LFS and their attorney contacted the

FBI, agent Chuck Prunier, as well as Attorney David Madoff who is an appointed federal

official who is Mr. Feinman's bankruptcy trustee for L. Feinman & Sons and Acushnet

Facility Maintenance 1893. They also contacted the New Bedford Police to make

allegations of Mr. Feinman's so-called wrong-doing, as well as that of Ryan Burke and

James Maurice.

16. LFS, Incorporated was a company formed at 1267 Main Street, Acushnet,

Massachusetts by Attorney Donald Barnes. This corporation was formed in true belief to

be a company owned by the former employees of L. Feinman & Sons and others. Mr. Feinman was the consultant for the company. There were over five meetings with the employees of L. Feinman & Sons at 1267 Main Street and at 195 Riverside Avenue. David Madoff, the trustee for the bankruptcies was told of Mr. Feinman's position in this corporation by the name of LFS, Incorporated. Mr. Feinman and his attorney fully disclosed that information. It was also disclosed at the initial bankruptcy hearing that Mr. Feinman moved all his files for all corporations and equipment to be stored at 195 Riverside Avenue for creditors to pick up, as well as other personal belongings. Mr. Feinman had an office at that facility with LFS and others.

17. The said owners of 195 Riverside Avenue, Dominic Nicolaci and Joel Anapol, were both in agreement to allow Mr. Feinman to take possession of this building. Mr. Feinman took with him the LFS corporation. It was understood by all parties and by Belleville Realty, Rosalie Hassey, who is the daughter of Dominic Nicolaci that Mr. Feinman would have his offices there as a consultant and all his equipment and paperwork and he was also allowed by Dominic Nicolaci to have LFS, Incorporated operate out of this facility. This agreement was consummated in June 2003. At that time, Dominic Nicolaci and Joel Anapol were in dispute because of business dealings and bankruptcy of Cliftex. Mr. Feinman wanted to make sure that both parties agreed and he met with Joel Anapol at said property. At that time, Joel Anapol also agreed. At no time did any officers of LFS, Inc. meet with Dominic Nicolaci or Joel Anapol to discuss their agreement because there was none. Mr. Feinman made the arrangements. During the months leading up to the order of

-9-

no trespass issued by Attorney Stewart Grimes, the following incidents occurred:

18.   Alex Feinman contacted a business associate of his, Robert Stickles, an architect who has offices in Arizona and Boston, Mass to help him develop the said property at 194 Riverside Avenue and 194R Riverside Avenue. The development idea of Mr. Feinman was for the third and fourth floors to be turned into an entertainment center which would have over 75,000 square feet per floor. Robert Stickles and Mr. Feinman met several times with Dominic Nicolaci and his daughter. Several proposals were written and months of research were devoted to this project.

19.   Mr. Feinman developed an idea for a recycling facility at this property. In conjunction with LFS and Dominic Nicolaci, this project was given oral approval by the City of New Bedford Conservation Committee. This project can bring over a period of time, millions of dollars into the coffeurs.

20.   Mr. Feinman was also instrumental in working with Mr. Nicolaci, Mr. Anapol and Rosalie Hassey, as well as Robert Stickles, in alleviating the problem at 194 Riverside Avenue in dealing with the heat situation. The lease agreement of Acushnet Rubber Manufacturing with Dominic Nicolaci and Joel Anapol has the building boilers owned by Acushnet Rubber and Acushnet Rubber would not supply heat to the top two floors with their boilers. The heat had to be bought from the building owner next door to 194 Riverside Avenue. Originally, both buildings were controlled by Cliftex who is in bankruptcy at present and the owners were the Mr. Nicolaci and Mr. Anapol. There was a loss of one hundred thousand dollars last year that was back-charged by Acushnet Rubber

to said building owners because of the no-heat situation of breaking pipes. Mr. Feinman and Mr. Stickles dealt with this situation for this coming winter. Dominic Nicolaci and Joel Anapol were both favored by the decision that Acushnet Rubber would pay for the heat this year. Mr. Feinman was working on putting new heating systems into said property next year which has taken him over two months of research and diligence, also supplying a back-up plan if Acushnet Rubber did not supply heat. Dominic Nicolaci was willing to give property away to his neighbor if Mr. Feinman did not work with them to get heat.

21. Dominic Nicolaci and Rosalie Hassey knew and helped Thomas Brunelle, James Burgess, Micheline Andrade and Bonnie Demers of LFS to force Mr. Feinman from said property for Mr. Nicolaci's own personal gains. He excluded Joel Anapol from his decision and personal gain. Dominic Nicolaci and his daughter, Rosalie Hassey, made an agreement with LFS, doing business as Loyal Fast Service on November 6, 2003 and signed on November 7, 2003 completely disclaiming Mr. Feinman's existence in said building knowing that by doing this, he allows LFS to put a no-trespass order against Mr. Feinman on said property.

22. On August 15, 2003, a letter was written by LFS stating that Mr. Feinman has a presence on such property and what his functions were (copy attached). E-mails from the architect to Mr. Feinman are attached showing that Dominic Nicolaci and his daughter want total control of the recycling facility.

23. Dominic Nicolaci told Mr. Feinman when they walked through the property and into the buildings to discard papers he did not want in said property and to discard valuables

-11-

superiors regarding his decisions. If any person who had a vendetta against Mr. Feinman in the court system, it should have been Mr. Alfonse. Mr. Alfonse's impartiality and his belief in fair justice gave Mr. Feinman an OR bail and let his wife take him home. By this arrest, it was false imprisonment that Mr. Feinman should not have been subject to. It also triggered the action Mr. Feinman took in Superior Court for relief. The relief was denied (see attached) by a superior court judge. The New Bedford Police Department was used as a spear for false imprisonment by the defendants.

27. Leading up to the above events regarding the no-trespass order and being fired as a consultant, employee or owner by the above individuals, Mr. Feinman was threatened by Thomas Brunelle and his uncle in September. He was threatened with bodily harm if he did not pay Mr. Brunelle additional money Mr. Brunelle claimed he was owed from L. Feinman & Sons. Mr. Brunelle's nephew, Jason Rudolf, was outside the building making allegations of harm. The same night, Mr. Feinman received numerous phone calls from Michelina Andrade and James Burgess asking him to overlook this incident because of Mr. Brunelle's drinking problem.

28. On or around Octoer 10, 2003, James Burgess went to Mr. Feinman's office at approximately 5:30 p.m. and started screaming and yelling in the shop area. Thomas Brunelle and James Burgess did not report to work this day. Thomas Brunelle said he was at work but he was out drinking. James Burgess physically beat Mr. Feinman up, ripping his glasses off and breaking them. He made threats that he and others were taking the business over. His reason was that a private detective stopped at his house and questioned his wife. There were several witnesses to this attack and they will testify accordingly.

-13-

This same night while speaking with Michelina Andrade, she told Mr. Feinman she spoke

with them and she didn't understand what they were doing.    At the same time, she kept

asking Mr. Feinman how his medical condition was.    She knew he was going through very

serious hip problems and was in agony from the assault.

On October 23, 2003, James Burgess again went into Mr. Feinman's office and assaulted

him.    He kicked him in his hip because he knew Mr. Feinman's hip was infected.    Two

individuals had to remove Mr. Burgess from the office.    Mr. Feinman told Mr. Burgess

not to come back.    After this attack, Mr. Feinman can and will give individuals' names

who witnessed the assault and who helped Mr. Feinman from getting beaten up anymore.

These attacks were all part of an underlying conspiracy to remove Mr. Feinman from said

company and from the community.    The other named defendants were all in harmony with

the above actions.    They have everything to gain by taking everything Mr. Feinman

worked for.    They have not made any monetary investment at all into the company except

Michelina Andrade who signed for ten vehicles in September.

29.    Mr. Feinman alleges that by their actions of having him restricted from said property

and incarcerated it enhanced their scheme, as well as that of others, for the purpose of

monetary gain.    Their attorney, Mr. Grimes, has also enhanced their ability by issuing no

trespass orders against residents which makes Mr. Feinman look revengeful and

aggressive to show physical force.    Mr. And Mrs. Feinman's friend went to see them and

he was also a friend of James Burgess.    He has visited the Feinmans previously.    The

above individuals from LFS used this friend as a prop to have the FBI knock at the

-14-

Feinman's door and threaten his wife saying that this friend threatened government

witnesses. In no way is this true.    They also told her they would "throw her ass in jail".

30. The FBI, Chuck Prunier, was called by Mr. Feinman and he would not return the call.

Mr. Feinman's attorney, Donald Barnes, called Mr. Prunier several times and he would

not return his call either.  It is Mr. Feinman's belief that the parties from LFS and others

are creating selective prosecution with this agent.  The agent issued a subpoena for papers

(attached) for all records of the following corporations, as well as the two individuals,

James Maurice and Ryan Burke.    When the agent interviewed Mr. Burke he told Mr.

Burke not to associate with Mr. Feinman as well as Mr. Barnes, who was representing Mr.

Burke on different private matters.

31. On November 5, 2003, Alex Feinman and his attorney met with the bankruptcy

trustee, David Madoff.  Mr. Feinman believes that Mr. Madoff knew at this time Mr.

Feinman was under investigation.  Why didn't he tell Mr. Feinman and his attorney at the

hearing that he was under grand jury investigation?  Attorney Barnes and Mr. Feinman

told Mr. Madoff about the sequence of events and about his papers and other items out of

Mr. Feinman's control and into the control of others who would manipulate any such

papers against Mr. Feinman.  Mr. Madoff made comments that he didn't care.  Mr.

Feinman's attorney, Donald Barnes, received a copy of the federal subpoena of his papers

and others  from Attorney Grimes, the attorney for LFS at Superior Court in Taunton on

November 13, 2003.

At a hearing, Mr. Feinman requested state relief of the no trespass order to retrieve his

-15 -

papers. This was denied by a superior court judge (see attached).

### RELIEF

WHEREFORE, the plaintiff demands financial and judicial compliance of the following;

1. LFS, Inc. be put into voluntary bankruptcy or appointed a trustee because allegations are being made against the plaintiff which are by face can look like a crime but factually is not, such as the cashing of customer's checks. They allege the checks were for Mr. Feinman's personal gain. Mr. Feinman can show the money was used for payroll and other business-related necessities such as fuel and material.

2. Request that the FBI and U.S. Attorney investigate the whole picture, not a selective prosecution such as outlined in their subpoena and allow Mr. Feinman to testify freely before the Grand Jury.

3. All papers and documents not subpoenaed by the Grand Jury be returned to Mr. Feinman and his attorney because some of these papers and correspondence will be used in Mr. Feinman's defense. By having the papers in the arms of the defendants it is like having a fox in the hen house. The defendants will do anything possible to manipulate and scheme for their own purposes.

4. Attach the assets of the said defendants, Michelina Andrade, Dominic Nicolaci, Rosalie Hassey, Thomas Brunelle, James Burgess and Chris Baty. Dominic Nicolaci is known to have converted all his assets to others because of his Cliftex bankruptcy.

5. Request a bankruptcy trustee other than David Madoff. As Mr. Feinman feels Mr. Madoff did not listen when Mr. Feinman told him from day one that all papers and

belongings were at 195 Riverside Avenue and he did not inform Mr. Feinman or his attorney regarding the investigation.

6. The Acushnet detective and the state prosecutor should be investigated for conduct unbecoming to their offices and to discover the arrest and the bail.

7. Discover why the state court and sheriff's department abused Mr. Feinman's health needs when they knew his medical condition.

8. Mr. Feinman has never fled or jumped bail. Why did the government allow such a large bail when there is no risk of flight.

9. Financial damages against the defendants who accused Mr. Feinman to stay in jail for no just reason.

10. Mr. Feinman's belongings be returned to him and also equipment which must be returned to vendors and other institutions.

11. Issue a restraining order against the defendants to stop sending literature out and making derogatory statements against the plaintiff and his family.

12. Investigate the assaults against Mr. Feinman by James Burgess and Thomas Brunelle.

13. Interview employees to show the defendants threatened them with loss of job if they associated with Mr. Feinman.

14. Attorney Donald Barnes be appointed by the Court to represent Mr. Feinman in this case. Mr. Feinman and his wife are in personal bankruptcy and do not have enough money to afford an attorney.

15. False imprisonment, wrongful detention, violation of M.G.L.A. Ch. 120, H.I. Massachusetts Civil Rights Act.

16. Against the private parties for false imprisonment, assault and battery, wrongful

detention.

17. Award the plaintiff his damages and costs.

The plaintiff demands a trial by jury.

Signature

Name        Alex Feinman, Pro Se

Address      1267 Main Street

Acushnet, Massachusetts  02743

Telephone    508-763-8090

-18 -