FILED
IN CLERKS OFFICE

2003 DEC 15  P 12: 35

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


PLAINTIFF:  Alex Feinman,
            1267 Main St., Acushnet, MA

                              DOCKET NO:  03  12301 GAO
                              CIVIL ACTION  42 U.S.C.A.  1983, 1991
V                             AND AMERICAN DISABILITIES ACT
                              AMENDED COMPLAINT, 12/16/03

DEFENDANTS:

Dominic Nicolaci, Fairhaven, MA
Michelina Andrade, 233 Smith St., New Bedford, MA.
Christopher Baty, 1489 Morton Ave., New Bedford, MA
James Burgess, 731 Cumberland Hill Road, Woonsocket, RI
Attorney Stewart Grimes, 448 County St., New Bedford, MA
Chief of Police, New Bedford Police Department, New Bedford, MA
Sheriff, Bristol County Sheriff's Department, New Bedford, MA
Bonnie Demers, New Bedford, MA
Rosalie Hassey, Mattapoisett, MA
LFS, Incorporated, 195 Riverside Ave., New Bedford, MA
Chuck Prunier, Special Agent, FBI, 20 Riverside Dr., Lakeville, MA
Detective Christopher Richmond, Acushnet Police Department.
State Attorney  Chris Markey, New Bedford, MA
Attorney David Madoff, Boston, MA
Thomas Brunelle, 126 Wood St., New Bedford, MA
Bail Commissioners, John Doe (1) and John Doe (2), State of Massachusetts
Carol Ver Cammen,  New Bedford, MA
Kenneth Ver Cammen, New Bedford, MA
Lydia Nicolaci, Fairhaven, MA
Shawn Gore, Falmouth, MA
Lieutenant Hebert and unknown officers, New Bedford Police Dept. New Bedford, MA
Judge David Turcotte, New Bedford District Court, New Bedford, MA
Nicole Mendonca, New Bedford, MA
Robert Quinones, New Bedford, MA
Stephanie Palmer, New Bedford, MA

## COMPLAINT

PARTIES:
Detective Christopher Richmond, Acushnet Police
District Attorney Christopher Markey
Attorney David Grimes
Sheriff, Bristol County
Dominic Nicolaci
Rosalie Hassey
Thomas Brunelle
Michelina Andrade
Christopher Baty
James Burgess
FBI Agent, Chuck Prunier
Attorney David Madoff, Bankruptcy Trustee
LFS, Incorporated
New Bedford Police Chief
Bonnie Demers
Bail Commissioners, John Doe (1) and John Doe (2), State of Massachusetts
Carol  Ver Cammen, New Bedford, MA
Kenneth Ver Cammen, New Bedford, MA
Lydia Nicolaci, Fairhaven, MA
Shawn Gore, Falmouth, MA
Lieutenant Hebert and unknown officers, New Bedford Police Dept., New Bedford, MA
Judge David Turcotte, New Bedford District Court, New Bedford, MA
Nicole Mendonca, New Bedford, MA
Robert Quinones, New Bedford, MA
Stephanie Palmer, New Bedford, MA

## JURISDICTION

This case has jurisdiction in violations of federal law 42 U.S.C.A. 1983, 1991 and

Americans with Disabilities Act of 1990, against state and federal officials as well as the

diversity of the case where the financial amounts exceed over $75,000. One or more of

the defendants, such as James Burgess, live outside Massachusetts, in the state of Rhode

Island and elsewhere in the United States.

## PRELIMINARY STATEMENT OF FACTS

1. Plaintiff will establish proof of violation of his civil rights by physical force, threats, intimidation, coercion and abuse of power by federal and state law enforcement officers out of color of the statutes. The above-named defendants and others not known at this time conspired as a whole to remove the plaintiff from the community as a free man by unlawful means.

2. Deprivation of the plaintiff's civil rights was created by key defendants who orchestrated other defendants to be involved who did not question the key defendants' acts.

3. The Constitution created a distinction between what is truly the responsibility of national police (FBI) and what is truly the responsibility of local police. The Founders undeniably left reposed in the states and denied the central government from having total authority of police power in state matters. The plaintiff will show that the New Bedford Police Department was enticed by a national police authority and neglected the plaintiff's civil rights.

4.   Misconduct by certain defendants who stood before the Court and took an oath to uphold the Constitution and the laws.   In the oath, it states "I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the Judge or Jury by any artifice or false statement of fact or law". It will be shown to the Court that these defendants abused such power and violated the plaintiff's civil rights for reasons of greed and hate.

5.  The plaintiff will show proof, by the arresting police officer's own statements and written report and his actions at the time of arrest, that the officer openly shopped with the assistant state's attorney for a reason to arrest the plaintiff in order to violate the plaintiff's civil rights.

6.  The assistant state's attorney took an oath to uphold the laws of the Constitution in a fair and equitable manner and to search for the truth. The plaintiff will show the assistant state's attorney did not search for the truth in his statements in Court but searched the internet for fictional stories without facts.    The plaintiff will also show that the state's assistant attorney had a conflict of interest and was informed of this prior to the hearing. It will also be shown that the initial bail amount was originally set at $3000 and without cause was increased to $100,000.

7.  The plaintiff will prove that the defendants, who worked with the plaintiff at 195 Riverside Avenue, New Bedford, Massachusetts and at 1267 Main Street, Acushnet, Massachusetts, manipulated the plaintiff by gaining his confidence to do the plaintiff harm.

8.  The plaintiff will prove that certain defendants physically attacked the plaintiff by punching and kicking him, tearing his glasses off and screaming hate obscenities at him.

9.  The plaintiff will show the Court that the defendants issued an illegal no-trespassing order for 195 Riverside Avenue, New Bedford, Massachusetts to prevent the plaintiff from being able to defend himself in a court of law for reasons of manipulation of the plaintiff's paperwork, personal effects, equipment belonging to creditors and others. The plaintiff will also show that by the defendants used the plaintiff's address books, files, and

book of business, not only to gain business for themselves but to harm the defendant by sending hate mail to his customers, friends, family and neighbors.

10.    The defendants threatened to fire other employees or not pay them if they associated with the plaintiff. They have carried out these threats violating the civil rights of present and past employees.

11.    The defendants manipulated vendors and creditors of the plaintiff by using equipment not owned by them on interstate highways without insurance or registrations. Lieutenant Hebert of the New Bedford Police Department conspired with the FBI agent not to intrude in this matter. It is also noted that Attorney Stewart Grimes told individuals and vendors that he was in control of all the bankruptcy assets, as well as the plaintiff's personal belongings. This can be proven by affidavits or having the individuals appear in Court. The plaintiff's attorney has written to Attorney Grimes and placed calls to the trustee which were ignored. Attorney Grimes flatly refused to release any of the plaintiff's property. Attorney Grimes conspired with the New Bedford Police Department, as well as the FBI, to control the plaintiff's property. By doing this, the defendants conspired in open theatre without any regard for controversy because they believed they were above the law. Violation of the plaintiff's and other individuals' civil rights if there was an accident with said vehicles and equipment and someone got hurt or killed.

12. The plaintiff will show the Court that one of the owners of record and his agent of 195 Riverside Avenue, New Bedford, Massachusetts manipulated an agreement made in June 2003 between the plaintiff and parties to use said premises. Because the defendants did not uphold their agreement, this caused the plaintiff to be illegally arrested and falsely imprisoned.

13. The plaintiff will show the Court that Judge Turcotte violated the plaintiff's civil rights by discriminating against the plaintiff under the American Disabilities Act by allowing the plaintiff to be abused and neglected by the Bristol County Sheriff's Department and in his courtroom. He refused to acknowledge the cries of the plaintiff in violation of the plaintiff's civil rights.

14. The Bristol County Sheriff's Department did not provide medical care for the plaintiff when they knew the plaintiff was sick and in need of medication prescribed by certified physicians. The sheriff's department lied to the plaintiff's family and others, assuring them the plaintiff had his prescribed medication. The sheriff's department went to the extent of isolating the plaintiff from the other inmates so the inmates would not hear the suffering of the plaintiff.    The sheriff of Bristol County is under the delusion that when a person is sent to the Bristol County correctional facility, he is sent there as punishment, not to be punished by his handlers. Violation of plaintiff's civil rights and American Disabilities Act.

15. The overt acts by the defendants in various stages of manipulation, coercion and violence were for one common goal, to force the plaintiff out of the company and other ventures which the plaintiff created, such as the recycling facility at 195 Riverside Avenue.

16. The plaintiff will show the Court that certain defendants were very instrumental in staging the demise of the plaintiff by triggering allegations that the plaintiff was going to assault them. They defendants enticed the government to investigate the plaintiff for economic crimes, such as bankruptcy fraud. They created new documents to block the defendant's access to 195 Riverside Avenue so he could not obtain his property and records. Without such property and records, the plaintiff could not defend himself against allegations. The plaintiff has proof that the defendants destroyed and manipulated his records. The plaintiff also has proof that the defendants are using and selling equipment illegally. The plaintiff has knowledge and proof that government agents have protected the defendants in their overall scheme out of the colors of the law. The plaintiff has proof that the bankruptcy trustee and attorney Stewart Grimes, the attorney for LFS, manipulated creditors and local police to enhance their scheme of violating the plaintiff's civil rights.

17. The bankruptcy trustee, who is a defendant in this case, acted in part as judge and jury, depriving the plaintiff of his right to have a federal judge order necessary remedies. The trustee is not a government employee, therefore, he had no right to block the plaintiff from obtaining his property. By the bankruptcy trustee conspiring with other defendants, the plaintiff will not able to defend himself in due course of time. Violation of civil rights.

18. The Court will see that some of the defendants manipulated the bail commissioners into not releasing the plaintiff because they made false allegations to the commissioners, causing the plaintiff false imprisonment.

19. The plaintiff believes the burden of proof has been established of the violations by the defendants.    If the Court  does not interject under the plaintiff's Motion for Preliminary Injunction, the plaintiff will be harmed by the defendants by being abused mentally and financially.  The defendants created such an umbrella of hate against the plaintiff and his family, there might be physical harm to the plaintiff and his family if the Court does not intervene.

## FACTS

20.  On October 26, 2003, while walking his dog near his residence, the plaintiff was arrested by detective Christopher Richmond of the Acushnet Police Department, Acushnet, Massachusetts at approximately 8:00 p.m.  Before being taken to the police department, the plaintiff called his attorney with his wife and  Detective Richmond present.  Detective Richmond wrongfully stated that he didn't know what the warrant was for.  The plaintiff was handcuffed and  taken to the Acushnet Police Department  by Detective Richmond.   The plaintiff asked him if this was the case he was investigating back in May of 2003 regarding the GAP, close to six months before this date, and Detective Richmond seemed very nervous regarding the situation.   Approximately ten minutes later, Detective Richmond said yes, the warrant was issued regarding the above GAP case.  He stated the plaintiff's  bail, according to the state's attorney, would be $3000.   The officer who transported the plaintiff to the jail told the plaintiff  he and other

officers did not know this warrant was at the police station. At all times, Detective

Richmond wanted to create and control the warrant with said district attorney,

Christopher Markey.

21.  The district attorney was Christopher Markey. Mr. Markey's brother is the

attorney on one of the plaintiff's bankruptcy cases who is representing Clean Rentals, a

creditor who the plaintiff owes a sizable amount of money to.

Detective Richmond made allegations in papers provided to the district attorney for

arraignment that the plaintiff "walked away" from a federal lock-up, used aliases and had

"borderline criminal complaints totaling tens of thousands of dollars over the past six

months". Detective Richmond acting under the colors of the law failed to investigate this

case thoroughly and bring prosecution immediately upon his finding and not to wait for

selective prosecution.  If the plaintiff was such a threat to the community or had a

history of running away, why the delay?

22. Detective Richmond should have told the court that the plaintiff sent a letter to the

chief of police and to the town selectmen stating that his companies, L. Feinman & Sons

and Acushnet Facility Maintenance, were in bankruptcy and he was relocating the offices

to 195 Riverside Avenue, New Bedford, Massachusetts with the same phone number

being forwarded.

23. Detective Richmond neglected to state that the plaintiff has been very active in the

community with the Acushnet Animal Gift Fund, that 1267 Main Street is his residence

and his former offices were in the back of his house. Detective Richmond also neglected

to mention that when the plaintiff walked away from a federal camp it was because his life was threatened and he was to testify on behalf of the federal government on prison corruption and the plaintiff was relocated to another federal prison. He also neglected to state that when the plaintiff had a federal parole violation in in early 1990's, he self surrendered to another federal prison camp. The alleged aliases that Detective Richmond stated the plaintiff used previously is a complete falsehood. The plaintiff never skipped bail or missed a court date. As a matter of fact, the plaintiff was working in conjunction with the federal government in the 1970's.

24. It is true that the plaintiff has family in the Philadelphia area but he owns a home in Acushnet with his wife where they reside. The plaintiff has lived in Massachusetts for seven years and has very strong ties to the community.

25. Detective Richmond and prosecutor Markey, on 10/21/03, were looking for anyone to press charges against the plaintiff. They contacted Bill Tessier of the GAP Corporation on 10/21/03 and asked him if he was still interested in pursuing criminal charges. Why then and not back in May?

26. On Friday, October 24, 2003, attorney Stewart Grimes, who is the attorney for a company by the name of LFS, Incorporated, whose principle officers are Michelina Andrade and Christopher Baty and whose other participants are Thomas Brunelle, James Burgess, Bonnie Demers, Carol Ver Cammen, Kenneth Ver Cammen, Robert Quinones and others unknown to the plaintiff, held a meeting of the board of directors of LFS, Incorporated to vote the defendant out of the corporation as a consultant, employee or

owner of said corporation.   At this same meeting, they dismissed Attorney Donald

Barnes as their attorney.

27.  It is plaintiff's belief that one of the parties or the attorney contacted Detective

Richmond or the district attorney, Chris Markey,  and schemed with them for their plans

from removing the plaintiff from said company and premises and to enhance their scheme

and had the plaintiff arrested and placed on an outrageous amount of bail of $100,000

regarding the GAP Corporation case which was a dispute of $3000.  This GAP case was

taken to small claims by the plaintiff on behalf of his companies and the plaintiff has proof

that the Gap Corporation and the vendor management corporation who represents the

GAP owed his companies, at that time, in excess of $12,000.  The plaintiff, at the time of

the small claims hearing with the GAP and their vendor management corporation, all

agreed that since the bankruptcy was filed at the same time of the small claims hearing, all

issues would be dealt with in the bankruptcy case.  Detective Richmond was informed of

this because the plaintiff stopped him when he was on road duty in the community to

inform him.   If Detective Richmond claimed bail was $3000, what was the cause of action

for the bail commissioner to set at $100,000?

28.   In this scheme, district attorney Markey read the same internet literature to the court

that Christopher Baty, Nicole Mendonca, Shawn Gore, Carol Ver Cammen, Robert

Quinones and others from LFS, Incorporated mailed or faxed to approximately 250

individuals who were either vendors or customers of the plaintiff.

29.  The plaintiff's attorney, Donald Barnes, asked District Attorney Markey to not

attend the bail hearing because there was a conflict of interest because of the relationship Mr. Markey had with his brother who was the attorney for Clean Rentals. Mr. Markey refused. He was the state prosecutor at the bail hearing and arraignment.

30. On October 27, 2003 attorney Grimes on behalf of LFS, Incorporated issued no-trespassing orders to the plaintiff, Mr. James Maurice and Mr. Ryan Burke who were also associates of LFS, Incorporated. The no-trespass order was served on the plaintiff while he was in custody at the Bristol County Sheriff's Department.

31. The Bristol County Sheriff's Department, Detective Richmond, and the state's attorney, Mr. Markey, knew that the plaintiff was on heavy doses of prescribed pain medication due to a chronic hip disorder. The medication prescribed to the plaintiff is Methadone issued by Dr. Joseph Audette at the Spaulding Hospital in Boston, Massachusetts. The plaintiff asked Detective Richmond if he could take his medication with him and Detective Richmond refused. The plaintiff requested medication from the sheriff's department and they refused. They told the plaintiff and his wife they would not dispense that type of medication. They told the plaintiff's wife her husband had been treated with medication when she telephone them and this was not true.

When the plaintiff was taken to the courthouse, he screamed in agony, he was urinating and vomiting at the same time from major pain and withdrawal symptoms. The plaintiff's attorney, Donald Barnes, addressed the court with the issue. The court refused to answer. The plaintiff was taken from the courtroom back to the prison and put in a holding cell with no treatment except a steel bench.

The sheriff's department and the Massachusetts district court judge, David Turcotte, as well as the state prosecutor knew of the plaintiff's medical situation and knew that mentally in this condition the plaintiff would not be able to help in his defense. The prison also knew that the plaintiff was sick and they allowed the constable to serve the no-trespass order on the plaintiff from LFS, Inc. It is the plaintiff's belief, it is an obligation of the justice who heard his pleas for help in the courtroom to protect his rights to medical treatment and not be allowed to go through terrible withdrawal and pain without being under the care of medical doctor. The sheriff's department laughed at the plaintiff in the holding cell and treated him like a diseased animal. They constantly lied to the plaintiff, saying they would get his medication.

32. To further the scheme, LFS, Inc. officers Michelina Andrade, Thomas Brunelle, James Burgess, Christopher Baty, Carol Ver Cammen,and Bonnie Demers conspired to call the clerk magistrate and tell them that the bail money to be used for the plaintiff was stolen to hinder his release from custody. They knew of the plaintiff's outcries in court because of severe pain and withdrawal symptoms. The above individuals conspired in their overall plan for control of LFS and the location of the company where the plaintiff had his papers and equipment stored at 195 Riverside Avenue, New Bedford, Mass. Why did the bail commissioner refuse the $10,000 on Monday, October 27, 2003?

33. On Tuesday, October 28, 2003, the plaintiff's wife went to the offices where the plaintiff and LFS had their offices. S. Caras Restoration also has space in this building as well. The building occupies 27,000 feet. She was screamed at and assaulted by Michelina

Andrade, Thomas Brunelle, Christopher Baty who spit in her face and told her to get out

of his building.  When Mrs. Feinman was leaving she was pushed out the door by

Christopher Baty.  When Mrs. Feinman was going to the courthouse with the bail money

to get her husband out of jail, Thomas Brunelle, Christopher Baty, James Burgess and

Michelina Andrade and others unknown went to the plaintiff's residence to retrieve a

company car in the name of LFS.  This car was behind a locked fence.  When they went to

the property, they knew what they were doing.  They breached the relationship with the

Feinman's and entered their property without permission by going into the house to

retrieve the keys and other valuables.  The plaintiff's handicap plaque card issued by the

state was in the car at they time they took it, breaking and entering to further their scheme.

It is the plaintiff's  belief that said individuals from LFS and their attorney contacted the

FBI, agent Chuck Prunier,  as well as Attorney David Madoff who is an attorney who is

the plaintiff's  bankruptcy trustee for L. Feinman & Sons and Acushnet Facility

Maintenance 1893.  They also contacted the New Bedford Police to make allegations of

the plaintiff's so-called wrong-doing, as well as that of Ryan Burke and James Maurice.

34.  LFS, Incorporated was a company formed at 1267 Main Street, Acushnet,

Massachusetts by Attorney Donald Barnes.  This corporation was formed in true belief to

be a company owned by the former employees of L. Feinman & Sons and others.  The

plaintiff  was the consultant for the company.  There were over five meetings with the

employees of L. Feinman & Sons at 1267 Main Street and at 195 Riverside Avenue.

David Madoff, the trustee for the bankruptcies was told of  the plaintiff's  position in this

corporation by the name of LFS, Incorporated. The plaintiff and his attorney fully

disclosed that information. It was also disclosed at the initial bankruptcy hearing that the

plaintiff moved all his files for all corporations and equipment to be stored at 195

Riverside Avenue for creditors to pick up, as well as other personal belongings. The

plaintiff had an office at that facility with LFS and others.

35. The said owners of 195 Riverside Avenue, Dominic Nicolaci, Lydia Nicolaci and Joel

Anapol, were all in agreement to allow the plaintiff to take possession of this building.

The plaintiff took with him the LFS corporation. It was understood by all parties and by

Belleville Realty, Rosalie Hassey, who is the daughter of Dominic Nicolaci and Lydia

Nicolaci that the plaintiff would have his offices there as a consultant and all his equipment

and paperwork and he was also allowed by Dominic Nicolaci to have LFS, Incorporated

operate out of this facility. This agreement was consummated in June 2003. At that time,

Dominic Nicolaci, Lydia Nicolaci and Joel Anapol were in dispute because of business

dealings and bankruptcy of Cliftex. The plaintiff wanted to make sure that both parties

agreed and he met with Joel Anapol at said property. At that time, Joel Anapol also

agreed. At no time did any officers of LFS, Inc. meet with Dominic Nicolaci or Joel

Anapol to discuss their agreement because there was none. The plaintiff made the

arrangements. During the months leading up to the order of

no trespass issued by Attorney Stewart Grimes, the following incidents occurred:

36.    The plaintiff contacted a business associate of his, Robert Stickles, an architect who

has offices in Arizona and Boston, Mass to help him develop the said property at 194

Riverside Avenue and 194R Riverside Avenue. The development idea of the plaintiff was for the third and fourth floors to be turned into an entertainment center which would have over 75,000 square feet per floor. Robert Stickles and the plaintiff met several times with Dominic Nicolaci Lydia Nicolaci and their daughter. Several proposals were written and months of research were devoted to this project.

37. The plaintiff developed an idea for a recycling facility at this property. In conjunction with LFS, Dominic Nicolaci, Lydia Nicolaci and Rosalie Hassey, this project was given oral approval by the City of New Bedford Conservation Committee. This project can bring over a period of time, millions of dollars into the coiffeurs. A new company was to be established by the name of Loyal Fast Service, Inc. The president was going to be Arthur Clark. The stock was to be issued to parties as follows: the landlord and his designee, the plaintiff, Arthur Clark and individuals from LFS. However, LFS, Inc. is using this name illegally without the approval of the other parties of Loyal Fast Service.

38. The plaintiff was also instrumental in working with Mr. Nicolaci, Mr. Anapol and Rosalie Hassey, as well as Robert Stickles, in alleviating the problem at 194 Riverside Avenue in dealing with the heat situation. The lease agreement of Acushnet Rubber Manufacturing with Dominic Nicolaci and Joel Anapol has the building boilers owned by Acushnet Rubber and Acushnet Rubber would not supply heat to the top two floors with their boilers. The heat had to be bought from the building owner next door to 194 Riverside Avenue. Originally, both buildings were controlled by Cliftex who is in bankruptcy at present and the owners were the Mr. Nicolaci and Mr. Anapol. There was a

loss of one hundred thousand dollars last year that was back-charged by Acushnet Rubber to said building owners because of the no-heat situation of breaking pipes. The plaintiff and Mr. Stickles dealt with this situation for this coming winter. Dominic Nicolaci and Joel Anapol were both favored by the decision that Acushnet Rubber would pay for the heat this year. The plaintiff was working on putting new heating systems into said property next year which has taken him over two months of research and diligence, also supplying a back-up plan if Acushnet Rubber did not supply heat. Dominic Nicolaci was willing to give property away to his neighbor if the plaintiff did not work with them to get heat.

39. Dominic Nicolaci, Lydia Nicolaci and Rosalie Hassey knew and helped Thomas Brunelle, James Burgess, Michelina Andrade, Bonnie Demers, Carol Ver Cammen, Kenneth Ver Cammen, Nicole Mendonca and Robert Quinones of LFS to force the plaintiff from said property for Mr. Nicolaci's own personal gains. He excluded Joel Anapol from his decision and personal gain. Dominic Nicolaci and his daughter, Rosalie Hassey and his wife made an agreement with LFS, doing business as Loyal Fast Service on November 6, 2003 and signed on November 7, 2003 completely disclaiming the plaintiff's existence in said building knowing that by doing this, he allows LFS to put a no-trespass order against the plaintiff on said property to avoid sharing the excess with the plaintiff.

40. On August 15, 2003, a letter was written by LFS stating that the plaintiff had a presence on such property and what his functions were. E-mails from the architect to the plaintiff will show that Dominic Nicolaci, Lydia Nicolaci and their daughter want total

control of the recycling facility.

41.  Dominic Nicolaci told the plaintiff when they walked through the property and into

the buildings to discard papers he did not want in said property and to discard valuables

that were found to not be owned by Mr. Nicolaci but by Mr. Anapol.  The papers and

items discarded (later found out by the plaintiff to be papers involved with the Cliftex

bankruptcy) could have helped Joel Anapol and others of the depth of Mr. Nicolaci's

involvement in the bankruptcy.  Some of the personal belongings of the Anapol's were put

on E-Bay for sale and approved by Dominic Nicolaci and his daughter.

42.  A certified copy of a letter the plaintiff received from Joel Anapol authorizing the

plaintiff to be on said property was ignored by the New Bedford Police Department.

43.  Chris Baty, Michelina Andrade James Burgess and Thomas Brunelle had a meeting

with their employees and told them if they associated or spoke with the plaintiff they in

any way they would be terminated from the company.  Some employees were terminated

for this reason.

44.  The plaintiff was arrested by the New Bedford Police Department on 10/30/03 when

he went to his office.  When he entered the premises, Shawn Gore, acting as manager for

LFS, called the police and had the plaintiff arrested for trespassing.  Clerk Magistrate

Alfonse was the bail administrator and he also sat on approximately 200 small claims

actions the plaintiff brought against corporations and individuals who owed him money on

behalf of L. Feinman & Sons and Acushnet Facility Maintenance.   This clerk magistrate

and the plaintiff were in disagreement regarding many issues.  The plaintiff wrote to Mr.

Alfonse's superiors regarding his decisions. If any person had a vendetta against the plaintiff in the court system, it should have been Mr. Alfonse. Mr. Alfonse's impartiality and his belief in fair justice gave the plaintiff an OR bail and let his wife take him home. By this arrest, it was false imprisonment that the plaintiff should not have been subject to. It also triggered the action the plaintiff took in Superior Court for relief. The relief was denied (see attached) by a superior court judge. The New Bedford Police Department was used as a spear for false imprisonment by the defendants.

45. Leading up to the above events regarding the no-trespass order and being fired as a consultant, employee or owner by the above individuals, the plaintiff was threatened by Thomas Brunelle and his uncle in September. He was threatened with bodily harm if he did not pay Mr. Brunelle additional money Mr. Brunelle claimed he was owed from L. Feinman & Sons. Mr. Brunelle's nephew, Jason Rudolf, was outside the building making allegations of harm. The same night, the plaintiff received numerous phone calls from Michelina Andrade and James Burgess asking him to overlook this incident because of Mr. Brunelle's drinking problem.

46. On or around October 10, 2003, James Burgess went to the plaintiff's office at approximately 5:30 p.m. and started screaming and yelling in the shop area. Thomas Brunelle and James Burgess did not report to work this day. Thomas Brunelle said he was at work but he was out drinking. James Burgess physically beat the plaintiff up, ripping his glasses off and breaking them. He made threats that he and others were taking the business over. His reason was that a private detective stopped at his house and questioned

his wife. There were several witnesses to this attack and they will testify accordingly. This same night while speaking with Michelina Andrade, she told the plaintiff that she spoke with them and she didn't understand what they were doing. At the same time, she kept asking the plaintiff how his medical condition was. She knew he was going through very serious hip problems and was in agony from the assault.

On October 23, 2003, James Burgess again went into the plaintiff's office and assaulted him. He kicked him in his hip because he knew the plaintiff's hip was infected. Two individuals had to remove Mr. Burgess from the office. The plaintiff told Mr. Burgess not to come back. After this attack, the plaintiff can and will give individuals' names who witnessed the assault and who helped the plaintiff from getting beaten up anymore. These attacks were all part of an underlying conspiracy to remove the plaintiff from said company and from the community. The other named defendants were all in harmony with the above actions. They have everything to gain by taking everything the plaintiff worked for. They have not made any monetary investment at all into the company except Michelina Andrade who signed for ten vehicles in September.

47. The plaintiff alleges that by their actions of having him restricted from said property and incarcerated, it enhanced their scheme, as well as that of others, for the purpose of monetary gain. Their attorney, Mr. Grimes, has also enhanced their ability by issuing no trespass orders against residents which makes the plaintiff look revengeful and aggressive to show physical force. A friend of the plaintiff and his wife visited them and this friend was also a friend of James Burgess. He has visited the Feinmans previously. The above

individuals from LFS used this friend as a prop to have the FBI knock at the plaintiff's door and threaten his wife saying that this friend threatened government witnesses. In no way is this true.

48. The FBI, Chuck Premier, was called by the plaintiff and he would not return the call. The plaintiff's attorney, Donald Barnes, called Mr. Prunier several times and Mr. Prunier did not return his calls either. It is the plaintiff's belief that the parties from LFS and others are creating selective prosecution with this agent. The agent issued a subpoena for all records of the following corporations, as well as the two individuals, James Maurice and Ryan Burke. When the agent interviewed Mr. Burke he told Mr. Burke not to associate with the plaintiff as well as Attorney Barnes, who was representing Mr. Burke on different private matters.

49. On November 5, 2003, the plaintiff and his attorney met with the bankruptcy trustee, David Madoff. The plaintiff believes that defendant Madoff knew at this time the plaintiff was under investigation. Why didn't he tell the plaintiff and his attorney at the hearing that he was under grand jury investigation? Attorney Barnes and the plaintiff told Mr. Madoff about the sequence of events and about his papers and other items out of the plaintiff's control and into the control of others who would manipulate any such papers against the plaintiff. Mr. Madoff made comments that he didn't care. The plaintiff's attorney, Donald Barnes, received a copy of the federal subpoenas from Attorney Grimes, the attorney for LFS at Superior Court in Taunton on November 13, 2003.

### RELIEF

WHEREFORE, the plaintiff demands financial and judicial compliance of the following;

1. LFS, Inc. to cease and desist using the name of Loyal Fast Service, Inc.

2. Request that the FBI and U.S. Attorney investigate the whole series of events with other FBI agents from internal affairs or OSI and stop the selective prosecution such as outlined in the plaintiff's preliminary statement. .

3. All papers and documents not subpoenaed by the Grand Jury be returned to the plaintiff and his attorney .

4. Attach the assets of the said defendants, Michelina Andrade, Dominic Nicolaci, Lydia Nicolaci, Rosalie Hassey, Thomas Brunelle, James Burgess, Bonnie Demers, Shawn Gore, Carol Ver Cammen, Kenneth Ver Cammen and Chris Baty.

5. Order the U. S. Trustee to appoint an overseer to review David Madoff's caseload as a trustee and report his findings to the Court.

6. Suspend Christopher Richmond from active duty until an internal investigation is completed regarding his wrongdoings and assess the town's financial obligation to the plaintiff.

7. Assess damages and financial responsibility of the state court, state attorney and the sheriff's department for violation of the plaintiff's rights.

8. The plaintiff requests the Court to lower the state court's bail to a responsible amount of recognizance.

9. Award financial damages against the defendants who caused the plaintiff to be falsely

imprisoned.

10. The plaintiff requests the Court to allow the plaintiff to return equipment and belongings to the rightful owners.

11. Issue a restraining order against the defendants to cease sending derogatory literature out and making hateful statements against the plaintiff and his family.

12. Investigate the physical assaults against the plaintiff by James Burgess and Thomas Brunelle to a grand jury for indictment.

13. Order the department of labor to investigate the unlawful firing of employees for associating with the plaintiff.

14. Order that Attorney Donald Barnes be appointed by the Court to represent the plaintiff in this case. The plaintiff and his wife are in personal bankruptcy and do not have enough money to afford an attorney.

15. False imprisonment, wrongful detention, violation of M.G.L.A. Ch. 120, H.I. Massachusetts Civil Rights Act and federal civil rights act of 1983, 1991 and the American Disabilities Act.

16. Issue a judgment against the private parties for false imprisonment, assault and battery, wrongful detention.

17. Award the plaintiff his damages and costs.

18. Award the plaintiff financial damages from the City of New Bedford Police Department.

19. Request the disbarment of Attorney Grimes from practicing law and assess financial damages to the plaintiff.

Pg. 24

The plaintiff demands a trial by jury.

Signature _____

Name      Alex Feinman, Pro Se

Address   1267 Main Street

          Acushnet, Massachusetts  02743

Telephone   508-763-8090

## CERTIFICATE OF SERVICE

I, Alex Feinman, do certify that on the 16th day of December 2003, I served the

Foregoing on the defendants by fax and by U.S. Mail.

_____

Alex Feinman