FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT A 11: 55

DISTRICT OF MASSACHUSETTS DISTRICT COURT
DISTRICT OF MASS.

Alex Feinman,
       Plaintiff

v.

Dominic Nicolaci, et al.
      Defendants

CASE NO. 03-12301-GAO
CIVIL ACTION 42 U.S.C.A., 1991
AND AMERICAN DISABILITIES
ACT, AMENDED COMPLAINT
9/9/04

## PRELIMINARY STATEMENT OF FACT

The plaintiff amends his complaint to conform to the recommendations of

the opinion of Judge Marianne Bowler. The plaintiff agrees with the Court

on issues under the Heck doctrine which allows the plaintiff to file his

Complaint against these individuals at a later date. The plaintiff stated to

the Court that his motions for preliminary and permanent injunctions have

evaporated are essentially moot at this time because of the action of the

Court in not hearing his pleadings in appropriate time. The plaintiff went

to the extent of filing a Motion to the First Circuit Court of Appeals to hear

his injunction pleadings.

(2)

The First Circuit Court of Appeals, as the District Court, took the plaintiff's cries for the right to be heard in a timely manner as a moot issue. The plaintiff, because of the actions of both Courts, lost items of value that cannot be replaced. The Courts allowed the defendants to do whatever they wanted with the plaintiff's personal belongs, business equipment, and family possessions and allowed the state Court to falsely imprison the plaintiff.

The plaintiff believes that if Judge O'Neil of the U.S. District Court acted promptly and without prejudice because the plaintiff filled pro so, the majority of the actions by the defendants would have not taken place. The plaintiff is on probation for trespassing in his own office. By being on probation, the plaintiff is falsely imprisoned. The New Bedford District Court judge, Lance Garth, did not allow the plaintiff to call witnesses in the trespassing case. The state attorney made false claims that the plaintiff's attorney should have produced a witness list and she filed a motion to this effect after the trial. Because Judge Garth blocked the truth, the plaintiff was found guilty of trespassing.

The New Bedford Police Department with acting orders from the Chief, allowed his officers to act as judge and jury. They allowed the defendants to

(3)

loot the premises of the plaintiff under their watch and knowingly knew the property did not belong to the defendants. By the actions of the Chief of Police of New Bedford for not training his officers in the laws of trespassing, the plaintiff was falsely imprisoned.

## PRELIMINARY STATEMENT OF FACTS

1. Plaintiff will establish proof of violation of his civil rights by physical force, threats, intimidation, coercion and abuse of power by federal and state law enforcement officers out of color of the statutes. The above-named defendants and others not known at this time conspired as a whole to remove the plaintiff from the community as a free man by unlawful means.

2. Deprivation of the plaintiff's civil rights was created by key defendants who orchestrated other defendants to be involved who did not question the key defendants' acts.

3. The Constitution created a distinction between what is truly the responsibility of national police (FBI) and what is truly the responsibility of local police. The Founders undeniably left reposed in the states and denied the central government from having total authority of police power in state matters. The plaintiff will show that the New Bedford Police Department was enticed by a national police authority and neglected the plaintiff's civil rights.

4. Misconduct by certain defendants who stood before the Court and took an oath to

(4)

uphold the Constitution and the laws.   In the oath, it states "I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the Judge or Jury by any artifice or false statement of fact or law". It will be shown to the Court that these defendants abused such power and violated the plaintiff's civil rights for reasons of greed and hate.

5.   The plaintiff will show proof, by the arresting police officer's own statements and written report and his actions at the time of arrest, that the officer openly shopped with the assistant state's attorney for a reason to arrest the plaintiff in order to violate the plaintiff's civil rights.

6.   The assistant state's attorney took an oath to uphold the laws of the Constitution in a fair and equitable manner and to search for the truth. The plaintiff will show the assistant state's attorney did not search for the truth in his statements in Court but searched the internet for fictional stories without facts.   The plaintiff will also show that the state's assistant attorney had a conflict of interest and was informed of this prior to the hearing. It will also be shown that the initial bail amount was originally set at $3000 and without cause was increased to $100,000.

7. The plaintiff will prove that the defendants, who worked with the plaintiff at 195 Riverside Avenue, New Bedford, Massachusetts and at 1267 Main Street, Acushnet, Massachusetts, manipulated the plaintiff by gaining his confidence to do the plaintiff harm.

8. The plaintiff will prove that certain defendants physically attacked the plaintiff by punching and kicking him, tearing his glasses off and screaming hate obscenities at him.

9. The plaintiff will show the Court that the defendants issued an illegal no-trespassing order for 195 Riverside Avenue, New Bedford, Massachusetts to prevent the plaintiff from being able to defend himself in a court of law for reasons of manipulation of the plaintiff's paperwork, personal effects, equipment belonging to creditors and others. The plaintiff will also show that by the defendants used the plaintiff's address books, files, and book of business, not only to gain business for themselves but to harm the defendant by sending hate mail to his customers, friends, family and neighbors.

10. The defendants threatened to fire other employees or not pay them if they associated with the plaintiff. They have carried out these threats violating the civil rights of present and past employees.

11. The defendants manipulated vendors and creditors of the plaintiff by using equipment not owned by them on interstate highways without insurance or registrations. Lieutenant Hebert of the New Bedford Police Department conspired with the FBI agent not to intrude in this matter. It is also noted that Attorney Stewart Grimes told individuals and vendors that he was in control of all the bankruptcy assets, as well as the plaintiff's personal belongings. This can be proven by affidavits or having the individuals appear in Court. The plaintiff's attorney has written to Attorney Grimes and placed calls to the trustee which were ignored. Attorney Grimes flatly refused to release any of the plaintiff's property. Attorney Grimes conspired with the New Bedford Police Department, as well as the FBI, to control the plaintiff's property. By doing this, the defendants conspired in open theatre without any regard for controversy because they

(6)

believed they were above the law.   Violation of the plaintiff's and other individuals' civil rights if there was an accident with said vehicles and equipment and someone got hurt or killed.

12.  The plaintiff will show the Court that one of the owners of record and his agent of 195 Riverside Avenue, New Bedford, Massachusetts manipulated an agreement made in June 2003 between the plaintiff and parties to use said premises.  Because the defendants did not uphold their agreement, this caused the plaintiff to be illegally arrested and falsely imprisoned.

13.  The plaintiff will show the Court that Judge Turcotte violated the plaintiff's civil rights  by discriminating against the plaintiff under the American Disabilities Act by allowing the plaintiff to be abused and neglected by the Bristol County Sheriff's Department and in his courtroom.  He refused to acknowledge the cries of the plaintiff in violation of the plaintiff's civil rights.

14.  The Bristol County Sheriff's Department did not provide medical care for the plaintiff when they knew the plaintiff was sick and in need of medication prescribed by certified physicians.  The sheriff's department lied to the plaintiff's family and others, assuring them the plaintiff had his prescribed medication.  The sheriff's department went to the extent of isolating the plaintiff from the other inmates so the inmates would not hear the suffering of the plaintiff.   The sheriff of Bristol County  is under the delusion that when a person is sent  to the Bristol County correctional facility, he is sent there as punishment, not to be punished by his handlers.  Violation of plaintiff's civil rights and American Disabilities Act.

(7)

15. The overt acts by the defendants in various stages of manipulation, coercion and violence were for one common goal, to force the plaintiff out of the company and other ventures which the plaintiff created, such as the recycling facility at 195 Riverside Avenue.

16. The plaintiff will show the Court that certain defendants were very instrumental in staging the demise of the plaintiff by triggering allegations that the plaintiff was going to assault them. They defendants enticed the government to investigate the plaintiff for economic crimes, such as bankruptcy fraud. They created new documents to block the defendant's access to 195 Riverside Avenue so he could not obtain his property and records. Without such property and records, the plaintiff could not defend himself against allegations. The plaintiff has proof that the defendants destroyed and manipulated his records. The plaintiff also has proof that the defendants are using and selling equipment illegally. The plaintiff has knowledge and proof that government agents have protected the defendants in their overall scheme out of the colors of the law. The plaintiff has proof that the bankruptcy trustee and attorney Stewart Grimes, the attorney for LFS, manipulated creditors and local police to enhance their scheme of violating the plaintiff's civil rights.

17. The bankruptcy trustee, who is a defendant in this case, acted in part as judge and jury, depriving the plaintiff of his right to have a federal judge order necessary remedies. The trustee is not a government employee, therefore, he had no right to block the plaintiff from obtaining his property. By the bankruptcy trustee conspiring with other defendants, the plaintiff will not able to defend himself in due course of time. Violation of civil

(8)

rights.

18. The Court will see that some of the defendants manipulated the bail commissioners into not releasing the plaintiff because they made false allegations to the commissioners, causing the plaintiff false imprisonment.

## FACTS

1. On October 26, 2003, while walking his dog near his residence, the plaintiff was arrested by detective Christopher Richmond of the Acushnet Police Department, Acushnet, Massachusetts at approximately 8:00 p.m. Before being taken to the police department, the plaintiff called his attorney with his wife and Detective Richmond present. Detective Richmond wrongfully stated that he didn't know what the warrant was for. The plaintiff was handcuffed and taken to the Acushnet Police Department by Detective Richmond. The plaintiff asked him if this was the case he was investigating back in May of 2003 regarding the GAP, close to six months before this date, and Detective Richmond seemed very nervous regarding the situation. Approximately ten minutes later, Detective Richmond said yes, the warrant was issued regarding the above GAP case. He stated the plaintiff's bail, according to the state's attorney, would be $3000. The officer who transported the plaintiff to the jail told the plaintiff he and other officers did not know this warrant was at the police station. At all times, Detective Richmond wanted to create and control the warrant with said district attorney, Christopher Markey.

21. The district attorney was Christopher Markey. Mr. Markey's brother is the attorney on one of the plaintiff's bankruptcy cases who is representing Clean Rentals, a creditor

who the plaintiff owes a sizable amount of money to.

Detective Richmond made allegations in papers provided to the district attorney for arraignment that the plaintiff "walked away" from a federal lock-up, used aliases and had "borderline criminal complaints totaling tens of thousands of dollars over the past six months". Detective Richmond acting under the colors of the law failed to investigate this case thoroughly and bring prosecution immediately upon his finding and not to wait for selective prosecution. If the plaintiff was such a threat to the community or had a history of running away, why the delay?

22. Detective Richmond should have told the court that the plaintiff sent a letter to the chief of police and to the town selectmen stating that his companies, L. Feinman & Sons and Acushnet Facility Maintenance, were in bankruptcy and he was relocating the offices to 195 Riverside Avenue, New Bedford, Massachusetts with the same phone number being forwarded.

23. Detective Richmond neglected to state that the plaintiff has been very active in the community with the Acushnet Animal Gift Fund, that 1267 Main Street is his residence and his former offices were in the back of his house. Detective Richmond also neglected to mention that when the plaintiff walked away from a federal camp it was because his life was threatened and he was to testify on behalf of the federal government on prison corruption and the plaintiff was relocated to another federal prison. He also neglected to state that when the plaintiff had a federal parole violation in in early 1990's, he self surrendered to another federal prison camp. The alleged aliases that Detective Richmond stated the plaintiff used previously is a complete falsehood. The plaintiff never skipped

(10)

bail or missed a court date. As a matter of fact, the plaintiff was working in conjunction with the federal government in the 1970's.

24. It is true that the plaintiff has family in the Philadelphia area but he owns a home in Acushnet with his wife where they reside. The plaintiff has lived in Massachusetts for seven years and has very strong ties to the community.

25. Detective Richmond and prosecutor Markey, on 10/21/03, were looking for anyone to press charges against the plaintiff. They contacted Bill Tessier of the GAP Corporation on 10/21/03 and asked him if he was still interested in pursuing criminal charges. Why then and not back in May?

26. On Friday, October 24, 2003, attorney Stewart Grimes, who is the attorney for a company by the name of LFS, Incorporated, whose principle officers are Michelina Andrade and Christopher Baty and whose other participants are Thomas Brunelle, James Burgess, Bonnie Demers, Carol Ver Cammen, Kenneth Ver Cammen, Robert Quinones and others unknown to the plaintiff, held a meeting of the board of directors of LFS, Incorporated to vote the defendant out of the corporation as a consultant, employee or owner of said corporation. At this same meeting, they dismissed Attorney Donald Barnes as their attorney.

27. It is plaintiff's belief that one of the parties or the attorney contacted Detective Richmond or the district attorney, Chris Markey, and schemed with them for their plans from removing the plaintiff from said company and premises and to enhance their scheme and had the plaintiff arrested and placed on an outrageous amount of bail of $100,000 regarding the GAP Corporation case which was a dispute of $3000. This GAP case was

taken to small claims by the plaintiff on behalf of his companies and the plaintiff has proof that the Gap Corporation and the vendor management corporation who represents the GAP owed his companies, at that time, in excess of $12,000. The plaintiff, at the time of the small claims hearing with the GAP and their vendor management corporation, all agreed that since the bankruptcy was filed at the same time of the small claims hearing, all issues would be dealt with in the bankruptcy case. Detective Richmond was informed of this because the plaintiff stopped him when he was on road duty in the community to inform him. If Detective Richmond claimed bail was $3000, what was the cause of action for the bail commissioner to set at $100,000?

28. In this scheme, district attorney Markey read the same internet literature to the court that Christopher Baty, Nicole Mendonca, Shawn Gore, Carol Ver Cammen, Robert Quinones and others from LFS, Incorporated mailed or faxed to approximately 250 individuals who were either vendors or customers of the plaintiff.

29. The plaintiff's attorney, Donald Barnes, asked District Attorney Markey to not attend the bail hearing because there was a conflict of interest because of the relationship Mr. Markey had with his brother who was the attorney for Clean Rentals. Mr. Markey refused. He was the state prosecutor at the bail hearing and arraignment.

30. On October 27, 2003 attorney Grimes on behalf of LFS, Incorporated issued no-trespassing orders to the plaintiff, Mr. James Maurice and Mr. Ryan Burke who were also associates of LFS, Incorporated. The no-trespass order was served on the plaintiff while he was in custody at the Bristol County Sheriff's Department.

31. The Bristol County Sheriff's Department, Detective Richmond, and the state's

(12)

attorney, Mr. Markey, knew that the plaintiff was on heavy doses of prescribed pain medication due to a chronic hip disorder. The medication prescribed to the plaintiff is Methadone issued by Dr. Joseph Audette at the Spaulding Hospital in Boston, Massachusetts. The plaintiff asked Detective Richmond if he could take his medication with him and Detective Richmond refused. The plaintiff requested medication from the sheriff's department and they refused. They told the plaintiff and his wife they would not dispense that type of medication. They told the plaintiff's wife her husband had been treated with medication when she telephone them and this was not true.

When the plaintiff was taken to the courthouse, he screamed in agony, he was urinating and vomiting at the same time from major pain and withdrawal symptoms. The plaintiff's attorney, Donald Barnes, addressed the court with the issue. The court refused to answer. The plaintiff was taken from the courtroom back to the prison and put in a holding cell with no treatment except a steel bench.

The sheriff's department and the Massachusetts district court judge, David Turcotte, as well as the state prosecutor knew of the plaintiff's medical situation and knew that mentally in this condition the plaintiff would not be able to help in his defense. The prison also knew that the plaintiff was sick and they allowed the constable to serve the no-trespass order on the plaintiff from LFS, Inc. It is the plaintiff's belief, it is an obligation of the justice who heard his pleas for help in the courtroom to protect his rights to medical treatment and not be allowed to go through terrible withdrawal and pain without being under the care of medical doctor. The sheriff's department laughed at the plaintiff in the holding cell and treated him like a diseased animal. They constantly lied

(13)

to the plaintiff, saying they would get his medication.

32. To further the scheme, LFS, Inc. officers Michelina Andrade, Thomas Brunelle, James Burgess, Christopher Baty, Carol Ver Cammen, and Bonnie Demers conspired to call the clerk magistrate and tell them that the bail money to be used for the plaintiff was stolen to hinder his release from custody. They knew of the plaintiff's outcries in court because of severe pain and withdrawal symptoms. The above individuals conspired in their overall plan for control of LFS and the location of the company where the plaintiff had his papers and equipment stored at 195 Riverside Avenue, New Bedford, Mass. Why did the bail commissioner refuse the $10,000 on Monday, October 27, 2003?

33. On Tuesday, October 28, 2003, the plaintiff's wife went to the offices where the plaintiff and LFS had their offices. S. Caras Restoration also has space in this building as well. The building occupies 27,000 feet. She was screamed at and assaulted by Michelina Andrade, Thomas Brunelle, Christopher Baty who spit in her face and told her to get out of his building. When Mrs. Feinman was leaving she was pushed out the door by Christopher Baty. When Mrs. Feinman was going to the courthouse with the bail money to get her husband out of jail, Thomas Brunelle, Christopher Baty, James Burgess and Michelina Andrade and others unknown went to the plaintiff's residence to retrieve a company car in the name of LFS. This car was behind a locked fence. When they went to the property, they knew what they were doing. They breached the relationship with the Feinman's and entered their property without permission by going into the house to retrieve the keys and other valuables. The plaintiff's handicap plaque card issued by the state was in the car at they time they took it, breaking and entering to further their

(14)

scheme.

It is the plaintiff's belief that said individuals from LFS and their attorney contacted the FBI, agent Chuck Prunier, as well as Attorney David Madoff who is an attorney who is the plaintiff's bankruptcy trustee for L. Feinman & Sons and Acushnet Facility Maintenance 1893. They also contacted the New Bedford Police to make allegations of the plaintiff's so-called wrong-doing, as well as that of Ryan Burke and James Maurice.

34. LFS, Incorporated was a company formed at 1267 Main Street, Acushnet, Massachusetts by Attorney Donald Barnes. This corporation was formed in true belief to be a company owned by the former employees of L. Feinman & Sons and others. The plaintiff was the consultant for the company. There were over five meetings with the employees of L. Feinman & Sons at 1267 Main Street and at 195 Riverside Avenue. David Madoff, the trustee for the bankruptcies was told of the plaintiff's position in this corporation by the name of LFS, Incorporated. The plaintiff and his attorney fully disclosed that information. It was also disclosed at the initial bankruptcy hearing that the plaintiff moved all his files for all corporations and equipment to be stored at 195 Riverside Avenue for creditors to pick up, as well as other personal belongings. The plaintiff had an office at that facility with LFS and others.

35. The said owners of 195 Riverside Avenue, Dominic Nicolaci, Lydia Nicolaci and Joel Anapol, were all in agreement to allow the plaintiff to take possession of this building. The plaintiff took with him the LFS corporation. It was understood by all parties and by Belleville Realty, Rosalie Hassey, who is the daughter of Dominic Nicolaci and Lydia Nicolaci that the plaintiff would have his offices there as a consultant and all

(15)

his equipment and paperwork and he was also allowed by Dominic Nicolaci to have LFS, Incorporated operate out of this facility. This agreement was consummated in June 2003. At that time, Dominic Nicolaci, Lydia Nicolaci and Joel Anapol were in dispute because of business dealings and bankruptcy of Cliftex. The plaintiff wanted to make sure that both parties agreed and he met with Joel Anapol at said property. At that time, Joel Anapol also agreed. At no time did any officers of LFS, Inc. meet with Dominic Nicolaci or Joel Anapol to discuss their agreement because there was none. The plaintiff made the arrangements. During the months leading up to the order of no trespass issued by Attorney Stewart Grimes, the following incidents occurred:

36.    The plaintiff contacted a business associate of his, Robert Stickles, an architect who has offices in Arizona and Boston, Mass to help him develop the said property at 194 Riverside Avenue and 194R Riverside Avenue. The development idea of the plaintiff was for the third and fourth floors to be turned into an entertainment center which would have over 75,000 square feet per floor. Robert Stickles and the plaintiff met several times with Dominic Nicolaci Lydia Nicolaci and their daughter. Several proposals were written and months of research were devoted to this project.

37. The plaintiff developed an idea for a recycling facility at this property. In conjunction with LFS, Dominic Nicolaci, Lydia Nicolaci and Rosalie Hassey, this project was given oral approval by the City of New Bedford Conservation Committee. This project can bring over a period of time, millions of dollars into the coiffeurs. A new company was to be established by the name of Loyal Fast Service, Inc. The president was going to be Arthur Clark. The stock was to be issued to parties as follows: the landlord

and his designee, the plaintiff, Arthur Clark and individuals from LFS. However, LFS, Inc. is using this name illegally without the approval of the other parties of Loyal Fast Service.

38. The plaintiff was also instrumental in working with Mr. Nicolaci, Mr. Anapol and Rosalie Hassey, as well as Robert Stickles, in alleviating the problem at 194 Riverside Avenue in dealing with the heat situation. The lease agreement of Acushnet Rubber Manufacturing with Dominic Nicolaci and Joel Anapol has the building boilers owned by Acushnet Rubber and Acushnet Rubber would not supply heat to the top two floors with their boilers. The heat had to be bought from the building owner next door to 194 Riverside Avenue. Originally, both buildings were controlled by Cliftex who is in bankruptcy at present and the owners were the Mr. Nicolaci and Mr. Anapol. There was a loss of one hundred thousand dollars last year that was back-charged by Acushnet Rubber to said building owners because of the no-heat situation of breaking pipes. The plaintiff and Mr. Stickles dealt with this situation for this coming winter. Dominic Nicolaci and Joel Anapol were both favored by the decision that Acushnet Rubber would pay for the heat this year. The plaintiff was working on putting new heating systems into said property next year which has taken him over two months of research and diligence, also supplying a back-up plan if Acushnet Rubber did not supply heat. Dominic Nicolaci was willing to give property away to his neighbor if the plaintiff did not work with them to get heat.

39. Dominic Nicolaci, Lydia Nicolaci and Rosalie Hassey knew and helped Thomas

(17)

Brunelle, James Burgess, Michelina Andrade, Bonnie Demers, Carol Ver Cammen, Kenneth Ver Cammen, Nicole Mendonca and Robert Quinones of LFS to force the plaintiff from said property for Mr. Nicolaci's own personal gains. He excluded Joel Anapol from his decision and personal gain. Dominic Nicolaci and his daughter, Rosalie Hassey and his wife made an agreement with LFS, doing business as Loyal Fast Service on November 6, 2003 and signed on November 7, 2003 completely disclaiming the plaintiff's existence in said building knowing that by doing this, he allows LFS to put a no-trespass order against the plaintiff on said property to avoid sharing the excess with the plaintiff.

40. On August 15, 2003, a letter was written by LFS stating that the plaintiff had a presence on such property and what his functions were. E-mails from the architect to the plaintiff will show that Dominic Nicolaci, Lydia Nicolaci and their daughter want total control of the recycling facility.

41. Dominic Nicolaci told the plaintiff when they walked through the property and into the buildings to discard papers he did not want in said property and to discard valuables that were found to not be owned by Mr. Nicolaci but by Mr. Anapol. The papers and items discarded (later found out by the plaintiff to be papers involved with the Cliftex bankruptcy) could have helped Joel Anapol and others of the depth of Mr. Nicolaci's involvement in the bankruptcy. Some of the personal belongings of the Anapol's were put on E-Bay for sale and approved by Dominic Nicolaci and his daughter.

42. A certified copy of a letter the plaintiff received from Joel Anapol authorizing the plaintiff to be on said property was ignored by the New Bedford Police Department.

(18)

43. Chris Baty, Michelina Andrade James Burgess and Thomas Brunelle had a meeting with their employees and told them if they associated or spoke with the plaintiff they in any way they would be terminated from the company. Some employees were terminated for this reason.

44. The plaintiff, with Ryan Burke, on 10/30/03 went to the New Bedford Police Department after leaving the office of Attorney Donald Barnes with paperwork to serve upon the New Bedford Police Department regarding the no-trespassing orders against the plaintiff and others. When the plaintiff arrived at the New Bedford Police Department, he and Mr. Burke spoke with the desk sargeant and the officer in charge. The plaintiff told the desk sargeant about his no-trespassing order placed upon him by LFS, Inc. Then , the plaintiff gave the desk sargeant a no-trespassing order against the employees of LFS, Inc. not to trespass in his offices at 195 Riverside Avenue. The desk sargeant and the commanding officer told the plaintiff it was a civil action and not a criminal action and they could not accept his paperwork. The plaintiff told them he was going to his office at 195 Riverside Avenue with Mr. Burke to serve papers on the people of LFS, Inc. who shared a common building with the plaintiff. Once the plaintiff arrived at the facility, one of the alleged officers of LFS called the police to report the plaintiff was trespassing. The New Bedford police went to the facility, looked at the papers the plaintiff was serving upon the people of LFS. The officer of the New Bedford Police Department was named Roy. He knew the plaintiff had a right to be this building. He saw the plaintiff's name on the door, he saw equipment and ownership papers for the equipment belonging to the plaintiff. The officer radioed the control center and in return, handcuffed the plaintiff and

(19)

locked him and took him to the New Bedford Police Department for processing. The
plaintiff, in his actions, showed the police department proof that he was not in violation
of any law. The chief of police and his officers made statements that in New Bedford,
they do as they want and Attorney Grimes told them the plaintiff was trespassing and
there was no court order. The plaintiff was falsely imprisoned and was not allowed to
take his medication or call his attorney or his family until he was taken to the county jail.
The plaintiff was arrested again by the New Bedford Police Department for trespassing
one month later. The plaintiff was taking one of his former employees to pick up his car
from another tenant in the building. The plaintiff did not get out of his car. At that time,
the plaintiff saw individuals taking the plaintiff's property out of the building and loading
it onto a truck. The plaintiff called the New Bedford Police Department and told them his
property was being stolen from 195 Riverside Avenue. The plaintiff waved down a
police car and in return, the officer wrote the plaintiff a citation for trespassing. He
detained the plaintiff for several hours, another charge of false imprisonment. As the
Court will note, the plaintiff was only trying to protect his property and by doing so, he
was arrested. The New Bedford Police Department made a spectacle of the plaintiff. The
outcome was that the plaintiff lost all his property and his freedom because he followed
the law.

45. Leading up to the above events regarding the no-trespass order and being fired as a
consultant, employee or owner by the  above individuals, the plaintiff was threatened by
Thomas Brunelle and his uncle in September. He was threatened with bodily harm if he
did not pay Mr. Brunelle additional money Mr. Brunelle claimed he was owed from L.

Feinman & Sons. Mr. Brunelle's nephew, Jason Rudolf, was outside the building making allegations of harm. The same night, the plaintiff received numerous phone calls from Michelina Andrade and James Burgess asking him to overlook this incident because of Mr. Brunelle's drinking problem.

46. On or around October 10, 2003, James Burgess went to the plaintiff's office at approximately 5:30 p.m. and started screaming and yelling in the shop area. Thomas Brunelle and James Burgess did not report to work this day. Thomas Brunelle said he was at work but he was out drinking. James Burgess physically beat the plaintiff up, ripping his glasses off and breaking them. He made threats that he and others were taking the business over. His reason was that a private detective stopped at his house and questioned his wife. There were several witnesses to this attack and they will testify accordingly. This same night while speaking with Michelina Andrade, she told the plaintiff that she spoke with them and she didn't understand what they were doing. At the same time, she kept asking the plaintiff how his medical condition was. She knew he was going through very serious hip problems and was in agony from the assault.

On October 23, 2003, James Burgess again went into the plaintiff's office and assaulted him. He kicked him in his hip because he knew the plaintiff's hip was infected. Two individuals had to remove Mr. Burgess from the office. The plaintiff told Mr. Burgess not to come back. After this attack, the plaintiff can and will give individuals' names who witnessed the assault and who helped the plaintiff from getting beaten up anymore. These attacks were all part of an underlying conspiracy to remove the plaintiff from said company and from the community. The other named defendants were all in harmony

(21)

with the above actions. They have everything to gain by taking everything the plaintiff worked for. They have not made any monetary investment at all into the company except Michelina Andrade who signed for ten vehicles in September.

47. The plaintiff alleges that by their actions of having him restricted from said property and incarcerated, it enhanced their scheme, as well as that of others, for the purpose of monetary gain. Their attorney, Mr. Grimes, has also enhanced their ability by issuing no trespass orders against residents which makes the plaintiff look revengeful and aggressive to show physical force. A friend of the plaintiff and his wife visited them and this friend was also a friend of James Burgess. He has visited the Feinmans previously. The above individuals from LFS used this friend as a prop to have the FBI knock at the plaintiff's door and threaten his wife saying that this friend threatened government witnesses. In no way is this true.

48. The FBI, Chuck Premier, was called by the plaintiff and he would not return the call. The plaintiff's attorney, Donald Barnes, called Mr. Prunier several times and Mr. Prunier did not return his calls either. It is the plaintiff's belief that the parties from LFS and others are creating selective prosecution with this agent. The agent issued a subpoena for all records of the following corporations, as well as the two individuals, James Maurice and Ryan Burke. When the agent interviewed Mr. Burke he told Mr. Burke not to associate with the plaintiff as well as Attorney Barnes, who was representing Mr. Burke on different private matters.

49. On November 5, 2003, the plaintiff and his attorney met with the bankruptcy trustee, David Madoff. The plaintiff believes that defendant Madoff knew at this time the

(22)

plaintiff was under investigation. Why didn't he tell the plaintiff and his attorney at the hearing that he was under grand jury investigation? Attorney Barnes and the plaintiff told Mr. Madoff about the sequence of events and about his papers and other items out of the plaintiff's control and into the control of others who would manipulate any such papers against the plaintiff. Mr. Madoff made comments that he didn't care. The plaintiff's attorney, Donald Barnes, received a copy of the federal subpoenas from Attorney Grimes, the attorney for LFS at Superior Court in Taunton on November 13, 2003.

50. On August 25, 2004, the plaintiff went to the bankruptcy hearing of Michelina Andrade. At this time, the plaintiff was able to ask questions such as where certain pieces of his family's possessions were such as the mink coats and jewelry of his late mother. Ms. Andrade admitted she had them. The coats have been returned to the plaintiff's family. This alone, will show the Court that in prior statements by this defendant and her attorney, Stewart Grimes, were false.

RELIEF

WHEREFORE, the plaintiff requests financial and judicial compliance of the following;

1. The trespassing cases against the plaintiff be overturned.

2. Request that the FBI and U.S. Attorney investigate the whole series of events with other FBI agents from internal affairs or OSI and stop the selective prosecution as outlined in the plaintiff's preliminary statement. .

3. All papers and documents not subpoenaed by the Grand Jury be returned to the plaintiff. An accounting of the paperwork the government has taken and where the papers were taken from. An accounting of the names of the people who took the papers

(23)

from Alex Feinman and Joyce Feinman, L. Feinman and Sons and Acushnet Facility Maintenance

4. Order the defendants to testify under oath with depositions of where the property and belongings of the plaintiff, his family and business associates is located now.

5. Order the New Bedford Police Department to pay damages for false imprisonment.

6. Order the New Bedford Police Department to attending training for trespassing laws.

7. Order the Bristol County Sheriff Department to pay the plaintiff the sum of $300,000 as well as Judge Turcotte for violating the plaintiff's right to have medical treatment.

8. Order Judge Lance Garth to stand trial for violating the plaintiff's right to have a fair and equitable trial without false statements and imprisonment created by his untruthful actions.

9. The plaintiff requests the upcoming trial regarding The Gap case be moved out of Bristol County to another jurisdiction because of the abuse and mishandling the plaintiff received in Bristol County.

9. Award financial damages against the defendants who caused the plaintiff to be falsely imprisoned.

10. Order Attorney Stewart Grimes be suspended from practicing law in Bristol County until the investigation of the Bristol County Court is finished because of his misdeeds and not telling the truth.

11. Request the plaintiff's lost wages and medical bills be the responsibility of the defendants who assaulted the plaintiff.

12. The plaintiff requests the Court to allow the plaintiff to return equipment and

(24)

belongings to the rightful owners.

13.    The federal court should give the plaintiff an answer regarding why it has taken so long to issue an answer to his pleadings.

14.  Investigate the physical assaults against the plaintiff by James Burgess and Thomas Brunelle to a grand jury for indictment.

15.  Order that Attorney Donald Barnes be appointed by the Court to represent the plaintiff in this case.  The plaintiff and his wife are in personal bankruptcy and do not have enough money to afford an attorney.

16.  Issue a judgment against the private parties for false imprisonment, assault and battery, wrongful detention.

17.  Award the plaintiff his damages and costs.

18.  Award the plaintiff financial damages from the City of New Bedford Police Department.

19.    The plaintiff requests a trial by jury.

Alex Feigman, Plaintiff

9/9/2004
Date

(25)

## CERTIFICATE OF SERVICE

I, Alex Feinman, do certify that on the 9th day of September 2004, I served the foregoing on the following by electronic mail/U.S. Mail.

Atty. John J. Cloherty
Atty. John J. Davis
Atty. Katharine Goree Doyle
Atty. Anton P. Giedt
Atty. Ernest Sarason
Atty. James W. Simpson
Atty. Joseph L. Tehan
Atty. William R. Connolly, Bristol County District Attorney's Office
Atty Stewart H. Grimes
U.S. Attorney Michael J. Sullivan

(26)