# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-12301-GAO

|  |  |
|---|---|
| ALEX FEINMAN,<br>    Plaintiff<br><br>v.<br><br>CHRISTOPHER RICHMOND,<br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **AFFIDAVIT OF SERGEANT CHRISTOPHER R. RICHMOND**

I, Christopher R. Richmond, hereby state and depose under the penalties of perjury:

1)  I am over the age of eighteen years, and understand the obligations of an oath.

2)  I am employed as a Police Sergeant for the Acushnet Police Department, Acushnet, Massachusetts, and have been so employed since April of 2005.

3)  Prior to holding the position of Sergeant, I was a Detective for the same department since February of 1999.

4)  Prior to holding the position of Detective, I was a Patrol Officer for the same department since March of 1995.

5)  I graduated from the Canton Police Academy in the summer of 1996, where I was trained on Constitutional Law and Criminal Procedure, and through that training I became very familiar with the concept of the need for probable cause to seek an arrest warrant or make a warrantless arrest of a citizen.

6)  I received my Masters Degree in Criminal Justice Administration from Western New England College in October of 2001, where I studied advanced courses in Constitutional Law and Criminal Procedure, and mastered the concept of the need for probable cause to seek an arrest warrant or make a warrantless arrest of a citizen.

7)  Every year since 1997, I have attended 40 hours of in-service training, which includes training on current issues involving Constitutional Law and Criminal

Procedure, and the concept of the need for probable cause to seek an arrest warrant or make a warrantless arrest of a citizen. Approximately five times since 1999 I have attended a 32-hour Advanced Detective Clinic, which was comprised of 32 hours of concentrated training on current issues involving Constitutional Law and Criminal Procedure, and the concept of the need for probable cause to seek an arrest warrant or make a warrantless arrest of a citizen.

8) On May 27, 2003, I was contacted by a man whom I had never met before, William Tessier, who identified himself as an employee of the GAP, Inc. corporate security department, at which time Mr. Tessier reported what he characterized as fraudulent charges on a GAP corporate credit card held by GAP executive Sherri McInnis with JP Morgan Chase Mastercard.

9) Mr. Tessier reported that $3,000.00 of the over $5,000.00 he reported as unauthorized charges were made on April 9, 2003 at the Parting Ways Texaco Service Station, 121 Main Street, Acushnet, Massachusetts, which was within my jurisdiction as an Acushnet Police Detective.

10) On or around Thursday, May 28, 2003, I spoke with George Pimental of the Parting Ways Gas Station, who reported that an employee of L. Feinman and Sons named "Stephanie" made the charges on the GAP credit card over the phone, to settle a $3,000.00 debt between L. Feinman and Sons and Parting Ways.

11) Mr. Pimental recalled that Stephanie explained to him that Alex Feinman, of L. Feinman and Sons, instructed her to use the card to settle the debt, and that they were authorized by the card holder to use the card for that purpose.

12) I then followed up with Mr. Tessier of GAP, who confirmed that the card information was given to L. Feinman and Sons as payment for $730.80 worth of work L. Feinman and Sons had performed for GAP, but Mr. Tessier denied that any further charges were authorized.

13) On June 11, 2003, L. Feinman and Sons employee Stephanie Palmer and Alex Feinman, who identified himself as the president of L. Feinman and Sons, came to the Acushnet Police Department to speak with me about the matter involving the charges on the GAP credit card, at which time Ms. Palmer verified that she was the individual that asked Parting Ways to charge the GAP credit card at Mr. Feinman's direction.

14) Mr. Feinman verified that the card information was given to him by GAP for the purpose of paying for a $730.80 job L. Feinman and Sons performed for GAP, and that he charged $730.80 at Lloyd's Market in Rochester, Massachusetts to pay down that debt. Mr. Feinman further stated to me that he took it upon himself to incur further charges on the GAP credit card account of $3,000.00 at Parting Ways and $2,000.00 at Boston Equipment in Salem, Massachusetts for the purpose of collecting on additional debt that GAP purportedly owed L. Feinman and Sons for other jobs L. Feinman and Sons performed for GAP.

15) On June 24, 2003, I met with Sherri McInnis, whom identified herself as a Regional Assistant for GAP, Inc. Ms. McInnis verified that she gave the credit card information to representatives of L. Feinman and Sons solely to pay for the $730.80 job, but when she received the credit card statement, no charges associated with an L. Feinman and Sons were found on the statement, a $730.80 charge was found for a Lloyd's Market in Rochester, Massachusetts, a $3,000.00 charge was made to Parting Ways Gas Station and $2,000.000 in charges were made to Boston Equipment; all of which she did not recognize.

16) During our meeting, Ms. McInnis stated that when giving L. Feinman and Sons the credit card information, she expressly authorized and expected only that L. Feinman and Sons would directly charge the card $730.80 for their services, and further stated that she did not expect or authorize L. Feinman and Sons to make any third party purchases or debt pay-downs with the credit card.

17) A check of the federal and state criminal offender registries, Acushnet Police Department files and public databases suggested that Alex Feinman had an extensive criminal record for fraudulent activities, that he had previously walked away from a federal penitentiary, that he had used several aliases in the past and that he had been the subject of several complaints with the Acushnet Police Department regarding issuing checks with insufficient funds, stopping payment on checks after issuing them for payment of a debt and failing to show up to perform work after receiving a $12,000.00 pre-payment from a homeowner.

18) I had no reason to disbelieve the testimony or question the integrity of any of the aforementioned individuals, including Mr. Feinman, who had admitted to posting unauthorized charges to the credit card account as a unilateral attempt to settle debts unrelated to the debt for which the card information was supplied. All witnesses appeared truthful and forthright, and were identifiable for prosecution should their reports prove false.

19) Based upon the aforementioned information, and based upon my extensive education, training and experience as an officer of the law, I believed as of October 21, 2003 and earlier, and believe today, that probable cause existed to pursue an arrest warrant for Mr. Feinman relating to the directing of the unauthorized use of a credit card at the Parting Ways Gas Station in Acushnet, Massachusetts on April 9, 2003, and I indeed swore to and articulated the above-mentioned facts in support of that warrant application on October 24, 2003.

20) Prior to applying for the warrant, I met with the Assistant District Attorney Christopher Markey, who advised me that Mr. Feinman's conduct violated Mass. Gen. Laws ch. 266 § 37C (credit card fraud and obtaining control over a credit card as security for a debt) and Mass. Gen. Laws ch. 266 § 30 (larceny by false pretenses), and it was by his expert counsel that I applied for an arrest for those specific charges. I did not select the specific charges personally.

21) On October 24, 2003, a local magistrate issued an arrest warrant for Alex Feinman to answer for violations of the aforementioned statute, pursuant to my warrant application.

22) On October 26, 2003 I was on routine patrol in the area of Main Street and Lantern Lane in Acushnet, Massachusetts, in my capacity as a police officer for the Acushnet Police Department, at which time I saw the man I recognized as Alex Feinman walking his dog eastbound on Lantern Lane. Knowing of the arrest warrant issued two days prior at my request, I advised Mr. Feinman of the existence of the warrant and arrested Mr. Feinman pursuant to the warrant after accompanying him to his house so that he could secure his dog, speak with his wife, and call his attorney. At the station I showed Mr. Feinman the warrant.

23) After arresting Mr. Feinman and delivering him to the custody of the Bristol County Sheriff's Office my duties as a police officer were complete, and I exercised no further control over his further incarceration or prosecution, other than making a bail recommendation.

24) On October 26, 2003, after placing Mr. Feinman in the custody of the Bristol County Sheriff's Office, I spoke to ADA Markey, who requested that I draft a bail recommendation attaching a copy Mr. Feinman's federal criminal record and articles from the Philadelphia Enquirer that ADA Markey knew I possessed detailing some of Mr. Feinman's criminal past. On that same date, I did as ADA Markey requested, recommending $3,000.00 for bail for Mr. Feinman. I believed and believe this amount to be reasonable, based upon the nature of the charges and the risk that Mr. Feinman might flee criminal prosecution based upon his known past.

25) At the subsequent bail hearing, upon information and belief, I have learned that the bail set was significantly higher than my recommendation, for reasons unrelated to the charges and bail recommendations stemming from my investigation.

26) There was never any discussion or agreement between myself and the Bristol County Prosecutor, the Bristol County Sheriff's Office, the Bail Commissioner, or any other person or entity relative to or with the objective of incarcerating Mr. Feinman in violation of his rights.

27) The decision to pursue a warrant and arrest Mr. Feinman resulted from my duties as an officer sworn to uphold the law, after discovering probable cause born of a thorough investigation that was initiated by a complaint from William Tessier of GAP, Inc., and subsequently corroborated by the physical evidence, statements and admissions of all involved.

28) Upon information and belief, the judge at Mr. Feinman criminal trial directed a verdict in Mr. Feinman's favor upon the grounds, incorrectly I respectfully believe, that the aforementioned statutes require that the subject be in actual and

physical possession of the credit card, and there was no dispute that Mr. Feinman never possessed the actual card. The larceny by false pretenses statute certainly does not require such possession, and I in good faith believed and still believe that using the credit card information amounted to constructive possession and control of the credit card and the credit card account for the purpose of the credit card fraud charges.

29) I believe that it was my lawful duty to investigate the complaint by GAP employees, and that I was acting lawfully when pursuing, obtaining and executing an arrest warrant for the plaintiff under the facts and circumstances revealed through that investigation.

30) Beyond seeking the arrest warrant, executing the arrest warrant and making bail recommendations, I played no role in pursuing the ongoing prosecution of Mr. Feinman, and did not testify at his trial.

31) The Town of Acushnet and the New Bedford District Court are located in Bristol County, Massachusetts.

32) I have reviewed the enclosed document dated May 28, 2003 from GAP, Inc. employee Bill Tessier, marked as Exhibit A, and attest that it is a true, complete and accurate copy of an eight page facsimile transmission from Mr. Tessier received by me on or around that date.

33) I have reviewed the enclosed copy of a May 29, 2003 letter from Sherri McInnis addressed, "To Whom It May Concern," attached as Exhibit B, and attests that it is a true and accurate copy of a cover letter (without the referenced enclosures) carbon copied to me by Ms. McInnis in or around June of 2003, outlining her position on this matter, as corroborated to me by her in person on June 24, 2003.

34) I have reviewed the enclosed copy of an undated letter from myself to the Bail Commissioner and the enclosed copies of articles from the Philadelphia Enquirer, attached as consolidated Exhibit C, and attest that it is a true and accurate copy of my bail request in this matter and one of two attachments. (Mr. Feinman's federal criminal record, though it was properly attached to and relevant to the Bail Request, is not attached herein out of concern that this might not be an authorized use of such materials under the applicable statutes.)

35) I have reviewed the enclosed copy of the arrest warrant in question, attached as consolidated Exhibit D, and attest that it is a true, accurate and complete copy of said warrant.

36) I have reviewed the enclosed eight pages, attached as consolidated Exhibit E, and attest that they are true and accurate copies of my formal investigative reports regarding the investigation that led to Alex Feinman's October 26, 2003 arrest.

Signed under the penalties and pains of perjury on this, the __21st__ day of

_June_ , 2006.

Sgt. Christopher R. Richmond

Sergeant Christopher R. Richmond
Acushnet Police Department

REBEKAH A. TOMLINSON
Notary Public
Commonwealth of Massachusetts
My Commission Expires
November 6, 2009

<u>Affidavit Exhibit A</u>

Eight Page Fax Dated May 28, 2003
from Bill Tessier of GAP, Inc.

1601 Trapelo Road
Waltham, MA 02451

**Gap Inc.**

# Fax 

| **To:** | Det Chris Richmond | **From:** | Bill Tessier |
|---|---|---|---|
| **Fax:** | 508 998 0201 | **Pages:** | 7 + Cover |
| **Phone:** | | **Date:** | 5/28/2003 |
| **Re:** | Fraudulent Charges | **CC:** | |

☐ **Urgent**    x **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

● **Comments:**

Chris –

Please review the attached documents. I have learned that the cardholder contacted the Texaco station @ 508 995 6646, to question the charges. An employee at the station stated that the charges were related to an L. Feinman.

The cardholder stated that Feinman was provided with the card number to pay for services performed in the Wrentham Gap store.

Also, Feinman has already filed a civil complaint in New Bedford District Court to collect an outstanding bill. Gap is named as a co-defendant in this matter.

If you have any questions or, would like additional information please contact me @ 617 794 9345

Thanks for your help!!

Bill Tessier

P.O. Box 57510
Salt Lake City, Utah 84157-0510

## Commercial Card Statement

**JPMorganChase**

| 03/25 | 03/23 | 6542791308322740 00600084 | HOMEWOOD SUITES MAHWAH MAHWAH | NJ | 1,091.12 |

| ARRIVAL DATE | DEPARTURE DATE | FOLIO NUMBER | NO | ROOM RATE | TAX |
|---|---|---|---|---|---|
| 03/24/03 | 03/24/03 | 0000046354 | | 0.00 | 0.00 |

| TELEPHONE | RESTAURANT | BAR/MINI-BAR | GIFT SHOP | LAUNDRY | OTHER | ADJUSTMENTS |
|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| 03/28 | 03/27 | 6048077308720046 9701186 | PAYRUS OF BURLINGTONMA BURLINGTON | MA | 23.21 |

--- SALES TAX ---  -------- ALTERNATE TAX --------

| CUSTOMER CODE | IND | AMOUNT | IND | AMOUNT | TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|---|
| | N | 0.00 | | 0.00 | | 0.00 | 0.00 |

- DESTINATION -  SHIP FROM  ------------ MERCHANT ------------

| POSTAL CD | CTY | POSTAL CD | TYPE | POSTAL CODE | TAX ID | ST/CNTRY | REFERENCE NUMBER |
|---|---|---|---|---|---|---|---|
| | USA | 01803 | 1000 | 0003270300 | 043609474 | MA | |

| 03/31 | 03/27 | 6841117308708700 03524608 | BANANA REPUBLIC #8108 BURLINGTON | MA | 70.00 |

| 03/31 | 03/27 | 6841117308708702 3431800 | GAP #2211/THE   BURLINGTON | MA | 70.00 |

| 03/31 | 03/28 | 6843425308728631 0223917 | SPARTAN PAINT-SPLY SVS WOBURN | MA | 4.42 |

--- SALES TAX ---  -------- ALTERNATE TAX --------

| CUSTOMER CODE | IND | AMOUNT | IND | AMOUNT | TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | | 0.00 | 0.00 |

- DESTINATION -  SHIP FROM  ------------ MERCHANT ------------

| POSTAL CD | CTY | POSTAL CD | TYPE | POSTAL CODE | TAX ID | ST/CNTRY | REFERENCE NUMBER |
|---|---|---|---|---|---|---|---|
| | USA | 01801 | 1000 | 0003260300 | 042484239 | MA | |

| 03/31 | 03/28 | 6542791308922740 0110180 | HOMEWOOD SUITES MAHWAH MAHWAH | NJ | 1,432.00 |

| ARRIVAL DATE | DEPARTURE DATE | FOLIO NUMBER | NO | ROOM GROUP RATE | TAX |
|---|---|---|---|---|---|
| 03/29/03 | 03/29/03 | 0000047120 | | 0.00 | 0.00 |

| TELEPHONE | RESTAURANT | BAR/MINI-BAR | GIFT SHOP | LAUNDRY | OTHER | ADJUSTMENTS |
|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| 03/31 | 03/28 | 6849967308864600 0001739 | BROOKS PHARM 578   WALTHAM | MA | 10.79 |

--- SALES TAX ---  -------- ALTERNATE TAX --------

| CUSTOMER CODE | IND | AMOUNT | IND | AMOUNT | TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | | 0.00 | 0.00 |

- DESTINATION -  SHIP FROM  ------------ MERCHANT ------------

| POSTAL CD | CTY | POSTAL CD | TYPE | POSTAL CODE | TAX ID | ST/CNTRY | REFERENCE NUMBER |
|---|---|---|---|---|---|---|---|
| | USA | 02930 | 1000 | 0003260300 | 042960844 | MA | |

| 03/31 | 03/28 | 6054186308800406 2049398 | STAPLES #36   WALTHAM | MA | 34.08 |

--- SALES TAX ---  -------- ALTERNATE TAX --------

| CUSTOMER CODE | IND | AMOUNT | IND | AMOUNT | TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|---|
| 000626432 | V | 1.62 | | 0.00 | | 0.00 | 0.00 |

- DESTINATION -  SHIP FROM  ------------ MERCHANT ------------

| POSTAL CD | CTY | POSTAL CD | TYPE | POSTAL CODE | TAX ID | ST/CNTRY | REFERENCE NUMBER |
|---|---|---|---|---|---|---|---|
| | | 02154 | 1118 | 02154 | 042896127 | MA | |

| 03/31 | 03/28 | 6054186308800406 2049034 | STAPLES #36   WALTHAM | MA | 3.66 |

--- SALES TAX ---  -------- ALTERNATE TAX --------

| CUSTOMER CODE | IND | AMOUNT | IND | AMOUNT | TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|---|
| 000626302 | Y | 0.17 | | 0.00 | | 0.00 | 0.00 |

- DESTINATION -  SHIP FROM  ------------ MERCHANT ------------

| POSTAL CD | CTY | POSTAL CD | TYPE | POSTAL CODE | TAX ID | ST/CNTRY | REFERENCE NUMBER |
|---|---|---|---|---|---|---|---|
| | | 02154 | 1119 | 02154 | 042896127 | MA | |

*Customized Technology . . . Personalized Solutions*

CONTINUED

P.O. Box 57510
Salt Lake City, Utah 84157-0510

# Commercial Card Statement                    ◆ JPMorganChase

| 03/31 | 03/29 | 6845093308950406840461167 MAGAZANIA.COM INC | TEL8774950511 SD | 9.95 |
|---|---|---|---|---|

```
            --- SALES TAX ---   -------ALTERNATE TAX -------
CUSTOMER CODE      IND      AMOUNT  IND     AMOUNT  TAX IDENTIFIER     DUTY AMOUNT        FREIGHT
0000000184324484            0.00           0.00                       0.00               0.00
- DESTINATION - SHIP FROM ----------------------- MERCHANT --------------------
POSTAL CD   CTY  POSTAL CD    TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
000000000         57105             57105        503500260  SD
```

| 04/02 | 04/01 | 6843286309100067906179 FAST CO. MEDIA GROUP | 800-642-6029 FL | 12.00 |
|---|---|---|---|---|

| 04/02 | 04/01 | 6841020309188013535191916 REBECCAS CAFE #13 | BOSTON   MA | 72.49 |
|---|---|---|---|---|

```
            --- SALES TAX ---   -------ALTERNATE TAX -------
CUSTOMER CODE      IND      AMOUNT  IND     AMOUNT  TAX IDENTIFIER     DUTY AMOUNT        FREIGHT
721313             Y        0.00           0.00                       0.00               0.00
- DESTINATION - SHIP FROM ----------------------- MERCHANT --------------------
POSTAL CD   CTY  POSTAL CD    TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
                             02210        043011224  MA
```

| 04/02 | 04/02 | 6843286309200073887187 BN *BARNESANDNOBLE.COM | 800-843-2665 NJ | 64.80 |
|---|---|---|---|---|

| 04/03 | 04/01 | 6542791309226400150027 HOMEWOOD SUITES MAHWAH | MAHWAH   NJ | 901.34 |
|---|---|---|---|---|

```
ARRIVAL    DEPARTURE  FOLIO     NO     ----------- ROOM -----------
DATE       DATE       NUMBER    SHOW   RATE           TAX
04/01/03   04/02/03   0000084354                0.00           0.00
TELEPHONE  RESTAURANT  BAR/MINI-BAR   GIFT SHOP   LAUNDRY     OTHER     ADJUSTMENTS
0.00         0.00        0.00           0.00        0.00       0.00
```

| 04/03 | 04/02 | 6843286309200078294453 ART.COM* | 800-95ALLWA NC | 58.98 |
|---|---|---|---|---|

| 04/04 | 04/02 | 6042814309338076942381 2 BIG PICTURE FRAMING | NEEDHAM HEIGH MA | 164.20 |
|---|---|---|---|---|

```
            --- SALES TAX ---   -------ALTERNATE TAX -------
CUSTOMER CODE      IND      AMOUNT  IND     AMOUNT  TAX IDENTIFIER     DUTY AMOUNT        FREIGHT
                   Y        0.00           0.00                       0.00               0.00
- DESTINATION - SHIP FROM ----------------------- MERCHANT --------------------
POSTAL CD   CTY  POSTAL CD    TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
                             10   02494          043519490  MA
```

| 04/04 | 04/03 | 6541020309388013535264 7 REBECCAS CAFE #13 | BOSTON   MA | 72.49 |
|---|---|---|---|---|

```
            --- SALES TAX ---   -------ALTERNATE TAX -------
CUSTOMER CODE      IND      AMOUNT  IND     AMOUNT  TAX IDENTIFIER     DUTY AMOUNT        FREIGHT
                   Y        0.00           0.00                       0.00               0.00
- DESTINATION - SHIP FROM ----------------------- MERCHANT --------------------
POSTAL CD   CTY  POSTAL CD    TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
                             02210        043011224  MA
```

| 04/08 | 04/07 | 6845917309812098447772 6 ELITE TRANSPORTATION | PEACHTREE CIT GA | 56.00 |
|---|---|---|---|---|

```
            --- SALES TAX ---   -------ALTERNATE TAX -------
CUSTOMER CODE      IND      AMOUNT  IND     AMOUNT  TAX IDENTIFIER     DUTY AMOUNT        FREIGHT
                            0.00           0.00                       0.00               0.00
- DESTINATION - SHIP FROM ----------------------- MERCHANT --------------------
POSTAL CD   CTY  POSTAL CD    TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
                             3000  30269          278562105  GA
```

| 04/09 | 04/08 | 6841020309880013636041 8 REBECCAS CAFE #13 | BOSTON   MA | 72.49- |
|---|---|---|---|---|

```
            --- SALES TAX ---   -------ALTERNATE TAX -------
CUSTOMER CODE      IND      AMOUNT  IND     AMOUNT  TAX IDENTIFIER     DUTY AMOUNT        FREIGHT
                            0.00           0.00                       0.00               0.00
- DESTINATION - SHIP FROM ----------------------- MERCHANT --------------------
POSTAL CD   CTY  POSTAL CD    TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
                             02210        043011224  MA
```

*Customized Technology . . . Personalized Solutions*

P.O. Box 57510
Salt Lake City, Utah 84157-0510

## Commercial Card Statement

### JPMorganChase

US = 020075 JPMC    PAGE    4

| 04/10 | 04/08 | 68481073098143911190033 | LLOYD S MARKET, INC | ROCHESTER | MA | 730.80 |

| CUSTOMER CODE | IND | --- SALES TAX --- AMOUNT | IND | ----------ALTERNATE TAX----------- AMOUNT  TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | 0.00 | 0.00 |
| - DESTINATION - POSTAL CD  CTY | SHIP FROM POSTAL CD | TYPE POSTAL CODE 1000  02770 | -------------- MERCHANT ----------------- TAX ID      ST/CNTRY  REFERENCE NUMBER 024800985 MA | | | |

508-763-8683

| 04/11 | 04/09 | 6743286310000021848O553 | TEXACO INC 11692220345 | ACUSHNET | MA | 500.00 |

| CUSTOMER CODE | IND | --- SALES TAX --- AMOUNT | IND | ----------ALTERNATE TAX----------- AMOUNT  TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | 0.00 | 0.00 |
| - DESTINATION - POSTAL CD  CTY | SHIP FROM POSTAL CD | TYPE POSTAL CODE 1000  02743 | -------------- MERCHANT ----------------- TAX ID      ST/CNTRY  REFERENCE NUMBER 83-0230188 | | | |

go to local
police dept
508.998.0240

| 04/11 | 04/09 | 6743286310000021848O561 | TEXACO INC 11692220345 | ACUSHNET | MA | 500.00 |

| CUSTOMER CODE | IND | --- SALES TAX --- AMOUNT | IND | ----------ALTERNATE TAX----------- AMOUNT  TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | 0.00 | 0.00 |
| - DESTINATION - POSTAL CD  CTY | SHIP FROM POSTAL CD | TYPE POSTAL CODE 1000  02743 | -------------- MERCHANT ----------------- TAX ID      ST/CNTRY  REFERENCE NUMBER 83-0230188 MA | | | |

| 04/11 | 04/09 | 6743286310000021848O579 | TEXACO INC 11692220345 | ACUSHNET | MA | 500.00 |

| CUSTOMER CODE | IND | --- SALES TAX --- AMOUNT | IND | ----------ALTERNATE TAX----------- AMOUNT  TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | 0.00 | 0.00 |
| - DESTINATION - POSTAL CD  CTY | SHIP FROM POSTAL CD | TYPE POSTAL CODE 1000  02743 | -------------- MERCHANT ----------------- TAX ID      ST/CNTRY  REFERENCE NUMBER 83-0230188 MA | | | |

| 04/11 | 04/09 | 6743286310000021848O587 | TEXACO INC 11692220345 | ACUSHNET | MA | 500.00 |

| CUSTOMER CODE | IND | --- SALES TAX --- AMOUNT | IND | ----------ALTERNATE TAX----------- AMOUNT  TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | 0.00 | 0.00 |
| - DESTINATION - POSTAL CD  CTY | SHIP FROM POSTAL CD | TYPE POSTAL CODE 1000  02743 | -------------- MERCHANT ----------------- TAX ID      ST/CNTRY  REFERENCE NUMBER 83-0230188 MA | | | |

| 04/11 | 04/09 | 6743286310000021848O595 | TEXACO INC 11692220345 | ACUSHNET | MA | 500.00 |

| CUSTOMER CODE | IND | --- SALES TAX --- AMOUNT | IND | ----------ALTERNATE TAX----------- AMOUNT  TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | 0.00 | 0.00 |
| - DESTINATION - POSTAL CD  CTY | SHIP FROM POSTAL CD | TYPE POSTAL CODE 1000  02743 | -------------- MERCHANT ----------------- TAX ID      ST/CNTRY  REFERENCE NUMBER 83-0230188 MA | | | |

| 04/11 | 04/09 | 6743286310000021848O603 | TEXACO INC 11692220345 | ACUSHNET | MA | 500.00 |

| CUSTOMER CODE | IND | --- SALES TAX --- AMOUNT | IND | ----------ALTERNATE TAX----------- AMOUNT  TAX IDENTIFIER | DUTY AMOUNT | FREIGHT |
|---|---|---|---|---|---|---|
| | | 0.00 | | 0.00 | 0.00 | 0.00 |
| - DESTINATION - POSTAL CD  CTY | SHIP FROM POSTAL CD | TYPE POSTAL CODE 1000  02743 | -------------- MERCHANT ----------------- TAX ID      ST/CNTRY  REFERENCE NUMBER 83-0230188 MA | | | |

L. Feiman   Stephanie or Alex
508-763-3947

508-995-6646 Texaco.

Serv 1-1155120-1

Customized Technology . . . Personalized Solutions

P.O. Box 57510
*Salt Lake City, Utah 84157-0510*

# Commercial Card Statement


**JPMorganChase**

US # 020075 JPMC    PAGE    5

| TRANS DATE | POST DATE | REFERENCE NUMBER | MERCHANT DESCRIPTION | | AMOUNT | |
|---|---|---|---|---|---|---|
| 04/14 | 04/11 | 68434253101200488952013 | BOSTON EQUIP & SPPLY C SALEM | NH | 2,000.00 | |

--- SALES TAX --- | ----ALTERNATE TAX ----
CUSTOMER CODE   IND        AMOUNT   IND        AMOUNT   TAX IDENTIFIER      DUTY AMOUNT     FREIGHT
                           0.00                0.00                           0.00          0.00
- DESTINATION -  SHIP FROM                     --------- MERCHANT ---------
POSTAL CD   CTY  POSTAL CD   TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
            USA  03079       2000  0020000016   030424490 NH

| 04/14 | 04/10 | 68450933101504068577611 | MAGAZANIA.COM INC    SIOUX FALLS   SD | | 9.95- | |

--- SALES TAX --- | ----ALTERNATE TAX ----
CUSTOMER CODE   IND        AMOUNT   IND        AMOUNT   TAX IDENTIFIER      DUTY AMOUNT     FREIGHT
                           0.00                0.00                           0.00          0.00
- DESTINATION -  SHIP FROM                     --------- MERCHANT ---------
POSTAL CD   CTY  POSTAL CD   TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
                            57106             603500250   SD

| 04/15 | 04/14 | 68434253104286310223209 | SPARTAN PAINT-SPLY SVS WOBURN   MA | | 18.10 | |

--- SALES TAX --- | ----ALTERNATE TAX ----
CUSTOMER CODE   IND        AMOUNT   IND        AMOUNT   TAX IDENTIFIER      DUTY AMOUNT     FREIGHT
                           0.00                0.00                           0.00          0.00
- DESTINATION -  SHIP FROM                     --------- MERCHANT ---------
POSTAL CD   CTY  POSTAL CD   TYPE  POSTAL CODE  TAX ID    ST/CNTRY  REFERENCE NUMBER
            USA  01801       1000  0000181016   042464239 MA

----------------- PAYMENTS, ADJUSTMENTS AND OTHERS -----------------

| 03/24 | 03/24 | 75476993083021063590981 | WIRE PAYMENT | | 13,456.95- | |

**⬛ JPMorganChase**

5/23/2003

### JP MORGAN CHASE
### AFFIDAVIT OF CREDIT CARD FRAUD

I, Sherri McInnis_____, certify that my aforementioned credit card/account number (5478990000103816) was stolen on _____ and used without my authorization.

I last used this card on _____, in the city of _____ state of _____ at the merchant _____ for the dollar amount of _____.

I certify that the following transactions were not made nor authorized by me:

| post date | tran date | merchant name | amount |
|-----------|-----------|---------------|--------|
| 04102003 | 04082003 | LLOYD S MARKET, INC ROCHE | 730.80 |
| 04112003 | 04092003 | TEXACO INC 11692220345 AC | 500.00 |
| 04112003 | 04092003 | TEXACO INC 11692220345 AC | 500.00 |
| 04112003 | 04092003 | TEXACO INC 11692220345 AC | 500.00 |
| 04112003 | 04092003 | TEXACO INC 11692220345 AC | 500.00 |
| 04112003 | 04092003 | TEXACO INC 11692220345 AC | 500.00 |
| 04112003 | 04092003 | TEXACO INC 11692220345 AC | 500.00 |
| 04142003 | 04112003 | BOSTON EQUIP & SPPLY C SA | 2000.00 |

I hereby authorize you to release any information concerning the fraudulent use of my credit card account to any local, state, or federal investigative agency or department.

I declare under penalty of perjury that the aforementioned is true and correct.

Police Report # _____

Police Department _____ phone: _____

_____        _____
Cardholder Signature                          date

*Please list any other unauthorized transactions not referenced above on a separate sheet.



**JP Morgan Chase**
**Suite 500**
**3949 South 700 East**
**SLC, Utah 84107**

SHERRI MCINNIS
GAP, INC.
RESEVOIR PLACE 2
1601 TRAPELO RD 3RD FLR
WALTHAM, MA 024517333

RE: Account 5478990000103816

5/23/2003

Dear SHERRI MCINNIS:

Enclosed you will find an affidavit of un-authorized use referencing the fraudulent charges on your aforementioned credit card. Please complete this form and return it to my attention at the address listed above, enclosing a copy of your current driver's license, to initiate an investigation on your behalf. **Please include your original credit card if it is still in your possession.**

We must receive your response within **15 business days** or we will assume the transactions are valid and will be included in your account balance.

If you have any further questions or require additional assistance, please do not hesitate to call me directly at 888-307-2990.

## Patricia Anguiano

Patricia Anguiano
Fraud Investigator

P.O. Box 57510
Salt Lake City, Utah 84157-0510

# Commercial Card Statement

## JPMorganChase

| 5478 9900 0010 3816 | 04/15/03 | 05/12/03 | $20,749.36 |
|---|---|---|---|

US JPMC CC03 YY  * 020075 S 1

MDG2003 00015161   2 MB  0694 08231S

**Please make check payable to:**

COMMERCIAL CARD SERVICES
P.O. BOX 78970
PHOENIX, AZ  85062-8970

SHERRI R MCINNIS
GAP, INC.
RESERVOIR PLACE 2
1601 TRAPELO RD  3RD FLR
WALTHAM                    MA 02451-7333
                                    015161

00000207493600000207493654789000103816

▼ Please detach here and send top portion with payment in enclosed envelope ▼

US = 020075 JPMC    PAGE    1

| 5478 9900 0010 3816 | 04/15/03 | 05/12/03 | 25,000 | 4,250.64 | 500 | 500.00 |
|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 03/17 | 03/13 | 69427913073027400860018 | HOMEWOOD SUITES MAHWAH MAHWAH | | NJ | 1,074.00 | ✓ |

ARRIVAL  DEPARTURE  FOLIO    NO    ---------- ROOM ----------
DATE     DATE       NUMBER   SHOW  RATE        TAX
11/09/02 03/13/03   0000047120      0.00       0.00
    TELEPHONE  RESTAURANT  BAR/MINI-BAR  GIFT SHOP  LAUNDRY    OTHER    ADJUSTMENTS
    0.00       0.00        0.00          0.00       0.00       0.00     0.00

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 03/20 | 03/19 | 67410203078980135585233 | REBECCAS CAFE #1 | BOSTON | MA | 49.98 | ✓ |

                ---- SALES TAX ----         -------ALTERNATE TAX-------
CUSTOMER CODE ·  IND     AMOUNT   IND     AMOUNT  TAX IDENTIFIER   DUTY AMOUNT    FREIGHT
721363           Y       0.00             0.00                     0.00          0.00
 - DESTINATION -  SHIP FROM         ----------- MERCHANT -----------
POSTAL CD   CTY  POSTAL CD   TYPE  POSTAL CODE  TAX ID   ST/ENTRY  REFERENCE NUMBER
                             10    02210        043011224 MA

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 03/24 | 03/20 | 69427913080026400030013 | HOMEWOOD SUITES MAHWAH MAHWAH | | NJ | 1,253.00 | ✓ |

ARRIVAL  DEPARTURE  FOLIO    NO    ---------- ROOM ----------
DATE     DATE       NUMBER   SHOW  RATE        TAX
11/09/02 11/08/02   0000047120      0.00       0.00
    TELEPHONE  RESTAURANT  BAR/MINI-BAR  GIFT SHOP  LAUNDRY    OTHER    ADJUSTMENTS
    0.00       0.00        0.00          0.00       0.00       0.00     0.00

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ✓ | 03/24 | 03/22 | 69427913080025400330363 | SHERATON HOTEL CROSSRO MAHWAH | | NJ | 838.07 | ✓ |

ARRIVAL  DEPARTURE  FOLIO    NO    ---------- ROOM ----------
DATE     DATE       NUMBER   SHOW  RATE        TAX
03/17/03 03/17/03   337767         0.00        0.00
    TELEPHONE  RESTAURANT  BAR/MINI-BAR  GIFT SHOP  LAUNDRY    OTHER    ADJUSTMENTS
    0.00       0.00        0.00          0.00       0.00       0.00     0.00

| | PERIODIC RATE | ANNUAL PERCENTAGE RATE | | | | |
|---|---|---|---|---|---|---|
| | | | | 0.00% | PREVIOUS BALANCE | 21,173.27 |
| PURCHASES: | 17,904.30 | 0.0000% | 0.00% | NUMBER OF DAYS IN THIS BILLING CYCLE | PURCHASES + | 13,115.48 |
| | | | | 32 | CASH ADVANCES + | 0.00 |
| | | | | | CREDITS − | 82.44- |
| | | | | | PAYMENTS − | 13,456.95- |
| | | | | 0.00 | OTHER CHARGES + | 0.00 |
| CASH ADVANCES: | 0.00 | 0.0000% | 0.00% | | FINANCE CHARGE + | 0.00 |
| | | | | 0.00 | NEW BALANCE = | 20,749.36 |

JPMC-A

*Customized Technology . . . Personalized Solutions*

CONTINUED

<u>Affidavit Exhibit B</u>

Statement Dated May 29, 2003 from
Sherri McInnis of GAP, Inc.



**Gap Inc.**

Gap
Banana Republic
Old Navy

Reservoir Place Two
1601 Trapelo Road
Waltham, MA 02451
781 839-8700 tel

May 29, 2003

To Whom It May Concern:

Re: Statement Docket 032003

On April 14, 2003; I authorized L. Feinman to charge $730.80 on my corporate credit card # 5478 9900 0010 3816 to pay invoice #30738, dated 3-10-2003 for work done at Gap Outlet Store #7734 at the Wrentham Outlet Shopping Center. At no time was authorization given for other charges to be applied to my card. I have never seen the original authorized charge on my statement.

I recently received my credit card statement and the following unauthorized charges were on my card:

| | |
|---|---|
| Texaco | $500.00 |
| Texaco | $500.00 |
| Texaco | $500.00 |
| Texaco | $500.00 |
| Texaco | $500.00 |
| Texaco | $500.00 |
| Lloyd's Market | $730.80 |
| Boston Supply | $2000.00 |
| **Total** | **$5730.80** |

Once I verified these charges as being unauthorized I immediately contacted Gap, Inc Corporate Credit Card company's (JP Morgan Chase) fraud division to report this and cancel my card. There is no fraud investigation number, but the contact there is Patricia Anguiano telephone number 888-307-2990. A police report was also filed, that number is 03-168-of , the detective on the case is Detective Chris Richmond of the Acushnet, MA police department.

Attached please find a copy of the credit card statement, the police report and the fraud investigation report.

Sincerely,

Sherri McInnis

<u>Affidavit Exhibit C</u>

Bail Recommendation and Supporting Documents
(Not Including Criminal Background Query Data)

TO:    Bail Commissioner
FROM: Detective Chris Richmond
       Acushnet Police Department
SUBJ:  Bail request

On Friday, October 24, 2003, with the assistance of Bristol County Assistant District
Attorney Chris Markey, an arrest warrant was obtained for Alex Feinman DOB 7/21/49.
The warrant was for several felony credit card fraud charges arising from an incident that
occurred on April 9, 2003 in Acushnet.

On Sunday, October 26, 2003, Feinman was arrested on that warrant.

Feinman has an extensive federal criminal history involving significant fraud charges. He
has once walked away from a minimum-security federal lockup. He has at least five
known aliases and strong roots in New Jersey and the Philadelphia, PA area.

Based on the above, Feinman may be a flight risk. ADA Markey was notified on the
arrest on Sunday evening, 10/26/03. After conferring with ADA Markey, I request bail be
set in the amount of $3000 (the dollar loss in the Acushnet case). Attached is a copy of
Feinman's federal record.


Respectfully,

Chris Richmond
Detective
Acushnet Police Department

October 2, 1987
**Section:** LOCAL
**Edition:** FINAL
**Page:** B13

## N.J. MAN IS GUILTY IN BAD-CHECK CASE
*Jane M. Von Bergen, Inquirer Staff Writer*

**Alex Feinman,** the con man who created million-dollar empires out of phony financial paper, wanted to make one thing perfectly clear in Camden County Superior Court yesterday.

"I'm a smart enough criminal to know not to sign my own name," he told Superior Court Judge Mary Ellen Talbott. "If I was going to cheat or fraud, I wouldn't go for pennies, your honor."

And compared with his past, when the Blackwood, N.J., man sold $46 million in phony surety bonds to construction contractors in New Jersey, the $4,500 he stole by writing bad checks was, indeed, pennies.

But it was enough money for Talbott yesterday to send him back for another year at the federal penitentiary in Danbury, Conn., where he had been serving time for a violation of his parole on the previous financial scams.

**Feinman,** 38, most recently of the 1600 block of Charter Oak Road in Blackwood, admitted that he knew there was no money to cover the checks, but he said he thought that his boss would cover them. He wrote the checks to suppliers and employees in November and December 1985, while working as executive officer for the Philadelphia-based H.M.C. Recycling Corp.

Yesterday, through a plea bargain, he pleaded guilty to theft by deception.

"At one time," **Feinman** told the judge, "I was a bad fellow. I would say I was a heavy-duty, white-collar, paper criminal."

In fact, he said, when federal prosecutors in Philadelphia wanted to delve into the criminal world of an international counterfeit securities ring, "they copied my crime scenario."

The investigation, dubbed Operation Gallstone, resulted in 29 indictments in 1985, took three undercover FBI agents on a 3 1/2-year paper chase from Hong Kong to London and exposed a little-known international network of financial fraud.

**Feinman,** while in prison in Allenwood, Pa., and also while on the streets, acted as a criminal consultant and undercover informant in Operation Gallstone. He helped the federal prosecutors negotiate their way through the international labyrinth of stolen securities.

His cooperation came in 1980 after a state grand jury in New Jersey returned an 80-count indictment against **Feinman** and a federal Philadelphia grand jury indicted him on 21 counts.

In both cases, the charges involved various forms of fraud pertaining to the insurance business, the sale of $46 million worth of phony surety bonds in New Jersey and an equally large scam pulled off from offices on Walnut Street in Philadelphia.

"It was one of the major crimes of insurance fraud," **Feinman** told Talbott yesterday.

Five years later, in 1985, **Feinman** had finished a stint in Allenwood and another stint in a halfway house in Camden. The former Moorestown man was employed at Cayuga Wrecking Co.

when his photo graced the front pages of newspapers in connection with news of Operation Gallstone in April 1985.

"It was a shock," he said. He lost his job.

He found another one with H.M.C. Recycling Corp., a Philadelphia-based company with ties to Ronald Raiton. Raiton disappeared into the federal witness-protection program in connection with narcotics prosecutions in Philadelphia.

Some court papers identify **Feinman** as an owner of the company. Hyman Perloff actually owned the company, **Feinman** said yesterday, although **Feinman**, as an executive officer, was empowered to sign checks.

It was those checks, written in November and December 1985 to employees and suppliers in Camden and Gloucester Counties, that bounced. **Feinman** said he made many of the checks good himself, drawing $40,000 or $50,000 from his own funds. Yesterday, he promised to pay back the others.

Neither Perloff nor other officials of the H.M.C. Recycling Corp., listed at the 7100 block of Grays Avenue, could be reached for comment yesterday.

"We entered into this plea bargain to wash our hands of it," said Assistant Camden County Prosecutor Peter Burcat yesterday. "To say the least, Mr. **Feinman** is not an honest man." He even cheated his last lawyer, Burcat said.

"Whatever he was then, he is not the same type of person now," said **Feinman**'s lawyer, Samuel Bullock, adding that he got his fee in cash.

As part of yesterday's plea agreement, an indictment charging him with possession of 5.5 grams of methamphetamine in Winslow Township, where he was stopped driving a 1985 Jaguar, were dropped.

Even though **Feinman** has relatively little time to spend in prison, he faces other problems. He owes the Internal Revenue Service $511,888, and he may owe prison officials more time. He has yet to be indicted for walking away from the minimum-security facility at Danbury in January, according to Danbury Camp Administrator Lee Enzor.

Nonetheless, **Feinman** has plans for the future. Yesterday, the twice-divorced, balding man, dressed in the standard baggy orange prison jumpsuit, asked Talbott to marry him.

She smiled, but refused: "I'm unalterably opposed to marriage for someone incarcerated." But she wished him luck and said she hoped he could find his way out of the "web" of trouble woven by his history of fraud.

"I do recognize you are an intelligent person," she said. "Unfortunately, you used that intelligence in the wrong way."



---

Copyright (c) 1987 The Philadelphia Inquirer

Subj:      **did you get this?**
Date:      06/22/2003 3:01:06 PM Pacific Daylight Time
From:      ▮▮▮▮▮▮▮▮▮▮
To:        ▮▮▮▮▮▮▮▮▮▮
*Sent from the Internet (Details)*

Marc,

If you get this, print it and bring it in for me. Our printer is down.

**EX-INFORMANT IS SENTENCED
TO 3 YEARS ON FRAUD COUNTS**

**Alex Feinman**, a con man and former government informant, was sentenced yesterday to three years in prison for submitting fraudulent surety bonds on demolition contracts to the city, a construction company and to the Chester Redevelopment Authority.

**Feinman**, 39, formerly of Jenkintown and South Jersey, pleaded guilty last month to four counts of mail fraud and one count of wire fraud. Assistant U.S. Attorney Walter S. Batty Jr. said **Feinman** was paroled in 1984 after serving a prison sentence for a similar scheme.

In 1980, **Feinman** began working as an informant in Operation Gallstone, an FBI investigation into counterfeit securities that resulted in 29 indictments in 1985. At the sentencing yesterday, the government stated that **Feinman** was cooperating in three other federal investigations. U.S. District Judge Louis C. Bechtle imposed a three-year probation, to follow the prison sentence.

**EX-GOVERNMENT INFORMANT**

**IS INDICTED ON FRAUD CHARGES**

**Alex Feinman**, a con man and former undercover informant for the government, was indicted yesterday on charges of submitting fraudulent surety bonds on three demolition contracts to the city, a construction company and to the Chester, Delaware County, Redevelopment Authority.

**Feinman**, 38, formerly of Jenkintown and South Jersey, was charged with four counts of mail fraud and one count of wire fraud. Assistant U.S. Attorney Walter S. Batty Jr. said that **Feinman** was paroled in 1984 after serving a prison sentence in connection with a similar scheme.

In 1980, **Feinman** began working as an undercover informant in Operation Gallstone, an FBI investigation into counterfeit securities that resulted in 29 indictments in 1985. If convicted of the new federal charges, **Feinman** could be sentenced to up to 27 years in prison and ordered to pay a $500,000 fine.

**Philadelphia Inquirer, The (PA)**

Monday, June 23, 2003 America Online: Grumpycoach55

Philadelphia Inquirer, The (PA)

April 25, 1985
**Section:** LOCAL
**Edition:** FINAL
**Page:** A01

## SEARCH FOR FINANCIAL 'MAGIC' LED CON MEN INTO FBI WEB
*Tim Weiner, Inquirer Staff Writer*

The telephone lines were humming up in Suite 900 at 1429 Walnut St. in the summer of 1979. A criminal alchemy was in the air. Two ingenious con men were making a crooked insurance company with no tangible assets disappear in Cherry Hill and reappear in Philadelphia, $115 million in the black.

John Valentine Goepfert, 50, a dapper insurance expert; **Alex Feinman**, 30, a balding Wunderkind of white-collar crime, and four of their colleagues buried the Somerset Insurance Co. after selling $46 million in phony surety bonds to construction contractors in New Jersey. Then they set up shop on Walnut Street under the name of Casualty & Indemnity Co. Ltd.

They needed what **Feinman** called "a little magic" to get C&I off the ground. At **Feinman's** request, a broker in New York named Seymour Pollack telephoned a convicted swindler named James Brewer in Miami, and asked whether he had any "paper."

Through a contact of Brewer's, C&I bought 86 counterfeit certificates of deposit purportedly issued by the Aeiola Bank and Trust Co. Ltd. of St. Vincent, in the West Indies. They had a face value of $43 million. **Feinman** and Pollack paid $1,000 for them.

With that, the seeds of an international FBI undercover investigation - one that eventually would lead to convictions of the men who profited from C&I's crimes - were planted. Tuesday, the FBI announced that the undercover operation, code-named Gallstone, had led to the seizure of $500 million in counterfeit securities, resulted in 29 indictments, took three undercover FBI agents on a 3 1/2-year paper chase from Hong Kong to London and exposed a little-known international network of financial fraud.

In 1979, Brewer had recently become a federal informant. He mentioned his conversation with Pollack to the FBI. Through Brewer and other contacts, FBI agents in Phoenix and Philadelphia would become aware of the illegitimate birth of C&I shortly after the company was conceived. The agents, posing as corrupt businessmen and lawyers, began dealing with the company, first in tape-recorded telephone conversations, then face-to-face.

"We were sitting inside the office; we were right there," said James J. Rohn, the federal attorney in Philadelphia who prosecuted the case against C& I's six conspirators. "We were able for the first time, to see the inside workings of the company."

In 1981, the six men were convicted.

The lesson federal prosecutors and FBI agents learned from the C&I case was profoundly disturbing: Swindlers had easy access to counterfeit securities, which they used as weapons in white-collar crimes.

But the FBI used that learning to create Operation Gallstone, the assault on white-collar criminals announced Tuesday. Gallstone also profited from the inside knowledge of Goepfert and **Feinman**, who, after receiving long prison terms, became crucial undercover informants for the investigation.

This is an account, drawn from federal court records and transcripts of secretly tape-recorded conversations compiled by the FBI in 1979 and 1980, of how the Gallstone investigation began.

"We saw the pattern in C&I," Rohn said. "We saw how six individuals set up a phony insurance company using $115 million of false assets . . . We saw how they were able to convince their victims that they were a viable company."

C&I sold surety bonds, which ensure a contractor's performance on a construction project. Businessmen paid fees in advance for the financial guarantees, which were worthless because C&I had no real assets.

"C&I's victims would go to look for their bond, and, essentially, it would be like a Western facade," Rohn said in an interview. "There would be a bunch of two-by-fours behind the scenery. There would be nothing holding the scenery up. There was nothing there."

In four months, the company, without real funds or the ability to issue real bonds, defrauded its customers of $365,000 and issued nearly $100 million in worthless financial guarantees.

C&I was built on the false financial bedrock of $87 million in counterfeit certificates of deposit held by a phony Caribbean bank. Those and other bogus financial instruments allowed an accountant working for C&I to concoct an audited financial statement showing C&I's net worth to be $115 million.

Goepfert worked behind the scenes as a sort of criminal consultant to C&I. The company's leader in Philadelphia was Feinman, "a cold, calculating criminal and con man" who had mastered "some of the most sophisticated confidence schemes and con techniques," Rohn told a federal judge in 1982.

"Feinman proved to be a master of the paper scam by taking a company worth nothing and creating a company, on paper, that was worth millions. . . . Feinman's sole objective was to defraud innocent and desperate victims out of substantial sums of money," Rohn said. Most of the victims had experienced difficulty obtaining bonds from other sources and had difficulty obtaining loans without financial guarantees, Rohn said. They had paid dearly for worthless paper.

**SINGLEG* In August 1979, Feinman and his partners set up shop at 1429 Walnut St. Before C&I could begin selling bogus financial guarantees, the company needed several tools of the swindler's trade.

Through the offices of two men subsequently convicted in the case, Seymour Pollack, the New York investment broker, and Lawrence Rush, an accountant, Feinman obtained an audited, but utterly phony, financial statement for C&I.

Overnight, on paper, C&I became an insurance company with $115,775,000 in assets.

Then, Feinman bribed a 31-year-old Cherry Hill stockbroker, Mark Snyder, to vouch for C&I's trustworthiness when potential victims telephoned seeking reassurance that they were dealing with a legitimate company. Snyder, who during this time had been an assistant vice president of E.F. Hutton Co. and later became a vice president at Bache Co., was convicted in the case.

Finally, C&I needed "paper" assets in the form of counterfeit certificates of deposit. Notwithstanding the fact that Rush had completed a certified audit showing the company was worth $115 million, the company had no assets - real or phony.

That problem was easily solved. The 86 fraudulent certificates of deposit from the Aeiola Bank and Trust Co. were delivered to Feinman and Pollack. Pollack also got his hands on several more phony CDs, under the name of Phoenix Trust Co., Tortola, British Virgin

Monday, June 23, 2003 America Online: Grumpycoach55

Islands, each with a face value of $5 million.

Feinman later described the CDs to undercover FBI agent Robert Bumpers. "You see, they can't stand any scrutiny," Feinman explained. "Basically, it's just a piece of paper."

In September 1979, Pollack gave Feinman the fraudulent financial statement, three $5 million Phoenix Trust CDs and forged and backdated trust letters. Copies of these documents were sent to customers as part of C&I's financial package, to convince victims that C&I was a thriving insurance company, possessed of assets that could satisfy defaults on bonds and guarantees.

The phony financial statement, the counterfeit CDs and the false references of Mark Snyder breathed life into C&I. But the FBI and the U.S. attorney's office in Philadelphia quickly had a death grip on the company.

The FBI isn't saying just how they got on to the scam, but weeks after C&I went into business, the company was unwittingly dealing with FBI agents on the telephone. The taped conversations were damning to the conspirators, and fascinating to the FBI.

"We knew we were looking at something unusual," said Rohn, the federal prosecutor. "It was unusual in that it was, essentially, a nationwide scam insurance company with offshore banking connections. By setting it up that way, they were able to elude the authorities, because people only saw one piece of the puzzle. For example, if an investor in Wisconsin is burned by the company, he goes to the local authorities or to the FBI, and all they see is somebody purchasing a bond. They can't see beyond the facade."

But the investigation let the FBI agents inside the company - to take the lid off C&I and look at the works.

In one early tape, recorded on Oct. 17, 1979, C&I representative Tom Scott placed a call from C&I's Walnut Street offices to a man he thought was a corrupt Phoenix businessman named Chuck Wilkins. Scott was trying to see if Wilkins - who was really a federal agent - could assist C&I as it attempted to foist its phony certificates of deposit off on unsuspecting banks.

"Let me ask you something, Chuckie," Scott said. "If I had a CD - the CD is issued to C&I, but I'm not going to mention who it's issued by; it's not stateside. All we want to do is take it, put it in the bank, to use it for guarantees. We don't want to put it on deposit. We don't want to draw interest. All we want is a banker, preferably a lawyer . . . to take it over to the bank, deposit it in a safe deposit box, and that's it. And for him to say, and for him to sign a receipt letter, stating he has received it and it is in their bank."

"Can I ask you some questions?" Wilkins said.

"Sure," Scott said.

"It's issued by an offshore bank?"

"Right."

"Will it stand up to any scrutiny?"

"Ah . . . not a whole lot," Scott said.

"Will it stand up to one phone call?"

"Yeah, it will stand up to one phone call."

"I think you need an attorney more than you need a bank," Wilkins said.

"If you get the kind of attorney I'm looking for, he knows what kind of bank we're looking for in most instances," said **Feinman**'s front man. "We need someone that will say exactly what we want to say. You know what I'm looking for."

"Yeah, I got the picture." Wilkins said.

"And, uh, " Scott stammered, "you know, there's some grease."

Wilkins provided C&I with a corrupt lawyer - FBI agent Robert Bumpers, using the pseudonym J. Daniel Davis.

Through "Davis," C&I thought it could place several of its CDs in small banks in Arizona, Nebraska and Missouri, using them as collateral for its worthless surety bonds.

In one such attempt, recorded by the FBI, Goepfert told a bank official in Ashland, Neb., that the CDs would generate lucrative premiums for the bank. "We're gonna do an awful lot of business, gonna be an awful lot of cash," Goepfert told the banker.

"Who the hell are you guys, in your red and white suits and your beards?" the banker replied.

By December 1979, **Feinman** was drinking champagne in Las Vegas with "Jay Davis." His defenses loosened by the camaraderie and the champagne, **Feinman** let slip that Goepfert was the organizing force behind the scenes at C&I.

He touted his and Goepfert's ability to generate fraudulent millions:

"My people, we feel, are some of the best insurance people in the country," **Feinman** said. "We're very creative and we know what we're doing. And we haven't been in jail yet."

In August 1980, **Feinman**, Goepfert, the broker Pollack, the accountant Rush, C&I frontman Scott and stockbroker Snyder were indicted in the C&I swindle by a federal grand jury in Philadelphia. All were convicted. Goepfert and **Feinman** subsequently agreed to cooperate with the Gallstone investigation. Along with their inside knowledge and impeccable white-collar crime credentials, the knowledge gleaned from the C&I investigation would, over the next three years, lead the FBI through an international maze of phony paper.

**Illustration:**PHOTO

PHOTO (1)

1. **Alex Feinman**, a mastermind in a crooked securities scheme, in his office at a club in 1980 (Special to The Inquirer / MARY D'ANELLA)



Copyright (c) 1985 The Philadelphia Inquirer

Philadelphia Inquirer, The (PA)

April 24, 1985
**Section:** LOCAL
**Edition:** FINAL
**Page:** A12

# A 3 -YEAR STING THAT TAPPED INTO A GLOBAL NETWORK
*Tim Weiner, Inquirer Staff Writer*

The Gallstone operation began in October 1981, when three agents in the FBI's Newtown Square office, a nondescript glass-and-stucco building on Route 252, created a company called Builders Casualty & Surety Ltd.

Posing as corrupt businessmen running an insurance company with offshore banking connections, agents Jim Vaules, Frank Kenney and Mike Melvin stung crooked financiers, counterfeiters and con men working in London, Liechtenstein, Grand Cayman Island, Hong Kong and across the United States.

In 3 1/2 years, the agents confiscated counterfeit securities with a face value of $500 million, including $200 million in phony certificates of deposit held by two Philadelphia brokers working in the Public Ledger Building on Chestnut Street. They were offered millions of dollars in stolen travelers' checks from the Taiwanese black market, hot Mercedes-Benz automobiles, phony Picassos and political influence.

Like Abdul Enterprises, the phony oil-rich conglomerate run by the imaginary sheik of Abscam, Builders Casualty existed solely in the minds of the FBI agents. Instead of corrupt politicians, however, their quarry was the creme de la creme of con artistry, and the hundreds of millions in counterfeits that were tools of that trade.

This account, based entirely on federal court records - trial transcripts, indictments, judgments of conviction and sworn affidavits - and fleshed out in conversations with federal prosecutors, is the story of how the FBI plugged into an international criminal network.

The paper flowed through a kind of global Casbah, "a big network of these guys who offer each other mechanisms to make money illegally," said Peter F. Vaira, who was the U.S. attorney in Philadelphia when Gallstone began.

"We knew that netherworld existed," Vaira said. "We sure didn't know the extent of it."

"This investigation was a great vehicle to tap into that whole underground," Vaira said, "and we realized when we tapped into it that it was an international situation."

Working with a convicted fraud turned federal informant, the agents put out the word that Builders Casualty was looking for "paper": forged and fraudulent certificates of deposit, counterfeit bonds and other bogus securities used in the sophisticated financial swindles of international con men.

Seizing the paper, and taking it out of circulation, was the aim of the sting.

The investigation already has led to the convictions of 15 members of the paper underground. Those con men trafficked in hundreds of millions of dollars in phony assets. The paper was used to create the illusion that they were respectable businessmen running financially solid companies. Their companies were in reality criminal conspiracies.

They swindled banks and investors by getting them to grant loans secured by counterfeit collateral. And businessmen were defrauded by paying advance fees for financial guarantees -

for example, surety bonds, used to guarantee a company's performance on a construction project. They thought they were buying
financial guarantees backed by real companies with real assets. They were dealing with companies that were shells, and they paid huge sums for worthless insurance.

**SINGLEG* Gallstone had its roots in a 1979 FBI investigation of a crooked surety- bonding company called Casualty & Indemnity Ltd. The company, based at 1429 Walnut St. in Philadelphia, was incorporated in the Central American nation of Belize and backed by $115 million in phony paper assets, including $87 million worth of fictitious certificates of deposit.

Casualty & Indemnity set up shop in August 1979. In six months, the six men eventually convicted in the case defrauded businessmen across the country of $365,000 by selling them worthless surety bonds. Most of the money went to **Alex Feinman**, a 30-year-old swindler from Moorestown, N.J., who conceived the company and, as tape-recorded evidence in the case showed, prided himself on his creation.

Said Luther Weaver, a former assistant U.S. attorney who prosecuted the C&I case in 1981: "These guys breathed life into a company with no money, a company with no employees, with no history . . . and got money from people who were desperate and needed bonds. It was a fascinating scheme."

"We saw the pattern in C&I," said First Assistant U.S. Attorney James J. Rohn, who prosecuted the case with Weaver and went on to take charge of Gallstone.

"C&I was essentially a nationwide scam insurance company with offshore banking commitments," Rohn said. "Its victims would go to look for their bonds and, essentially, it would be like a Western facade. There would be a bunch of two-by-fours behind the scenery. There would be nothing holding the scenery up. There was nothing there."

One of C&I's victims was Robert Vincent, a construction executive from Benton, Pa. In September 1979, the conspirators took $43,000 in $100 bills
from Vincent in exchange for a worthless $1.5 million construction bond, and gambled the money away in Atlantic City, evidence at the trial showed.

Another victim was the Riggs National Bank in Washington, D.C., where C&I deposited a counterfeit $5 million certificate of deposit and used it as phony collateral for loans to businessmen.

**Feinman**, who was to become a key informant in the Gallstone case while serving a six-year prison sentence, boasted about the scheme to an undercover FBI agent in December 1979 in a tape-recorded conversation later used as evidence against him.

"We're very creative and we know what we're doing," **Feinman** said. "And we haven't been in jail yet."

But the six men who created C&I, including **Feinman**, were convicted in 1981 in U.S. District Court in Philadelphia. The trial gave Rohn and the FBI agents an expanded understanding of paper swindles and gave them confidence that they could infiltrate and destroy similar frauds by creating an undercover company.

The case even provided them with tools to do so: the cooperation of **Alex Feinman** and John Valentine Goepfert.

Goepfert was the behind-the-scenes genius of Casualty & Indemnity, a circumspect, smooth-talking insurance wheeler-dealer who lived on a lavish estate in Wall Township, Monmouth County, N.J.

Goepfert's conviction in the C&I case brought him a five-year sentence. Later in 1981, he was sentenced to 10 years by a federal judge in New York for stealing more than $1 million from an underwriting firm that was part of Lloyd's of London.

In October 1981, facing the possibility of spending the rest of the decade in prison, Goepfert offered to cooperate with the FBI. Over the next year, his inside knowledge of financial scams would lead the FBI through an international paper maze.

Today, Goepfert, 56, is about to be released from the Allenwood Federal Prison Camp, where he has been an inmate for the last 2 1/2 years - and where he continued to work undercover for Gallstone.

"Con men are interesting," Weaver mused. "Getting caught is a game to them. . . . Goepfert came in and said, 'It behooves me to cooperate,' but he was not born again or anything. He just conned different people."

**SINGLEG* The FBI agents modeled Builders Casualty after Casualty & Indemnity, creating the facade of a fraudulent insurance company.

"We said we had formed an offshore insurance company that was looking for 'paper' that could withstand some scrutiny, and we put that word out through Jack Goepfert," Rohn said.

Goepfert sought out his old contacts, a loose-knit confederation of counterfeiters and swindlers whom he drew into Gallstone's web. The first was Leonard Sloane, a Bala Cynwyd broker who brought counterfeit securities from Hong Kong into the United States via the Philippines. In 1981, Sloane was working with David A. Najohn in Suite 354 of the Public Ledger Building at Seventh and Chestnut Streets.

Their eventual convictions showed Najohn and Sloane to be experts in importing and distributing phony certificates of deposit. Among their assets were hundreds of counterfeit CDs issued by a Guatemalan bank, Banco del Ejercito. That paper alone gave them a fraudulent net worth of $200 million.

Court records show that in October 1981, Goepfert met Sloane in Philadelphia and explained that he wanted to buy $1.5 million in phony certificates of deposit for Builders Casualty. Sloane gave Goepfert a sample of his wares - a photocopy of a $500,000 certificate of deposit on the American Commerce Bank of Taipei, Taiwan, a shell corporation based on Grand Cayman Island, the tax- free Caribbean refuge that is the world capital of paper banks.

The $500,000 CD looked legitimate, but it was a phony. It was precisely what the FBI was looking for.

In November, Sloane gave undercover agent Vaules three of the phony $500,000 CDs. The agent assured Sloane he would receive a fee of 10 percent of the face value of the paper - $150,000 on this deal alone - out of future premiums and fees generated by Builders Casualty.

Sloane was hooked. He was Gallstone's first catch. The agents strung him along for eight months, until June 1982, when they confronted him with his crimes and convinced him to become an informant. Sloane would lead the agents to a man wanted throughout the Western Hemisphere - the elusive Richard Stephen Keats.

**SINGLEG* Prosecutors in the United States, Britain and Switzerland describe Keats as a protean con man - for a decade, one of the world's most prolific paperhangers.

Between 1974 and 1979, Keats was indicted in Los Angeles, New York and London on charges involving a total of $18.5 million in fraudulent schemes, including a plot to convert $12 million in counterfeit U.S. Treasury bills to cash. He was convicted in Los Angeles on conspiracy and

forgery charges in 1976.

In 1981 and 1982, as Gallstone took shape, Keats was traveling in the United States, Canada, Britain, France, Spain and Switzerland, foisting more than $25 million in forged U.S. and Eurodollar bonds off on banks, according to British and Swiss authorities.

"He was shipping those bonds like confetti," said Peter Gasser, the public prosecutor in Zurich.

Where did Keats' paper come from? "It was determined that a substantial number of securities were stolen out of brokerage houses in New York, duplicated in Europe by a printer . . . and those securities were provided to Mr. Keats in London," Rohn, the federal prosecutor, told a judge in October 1983.

And where did it go? The full scope of Keats' work in the 1980s may never be known, for more of his paper is almost certainly sitting undetected in bank vaults throughout Europe, British and Swiss investigators said.

"Some of this stuff is still sitting in some banks in Europe like a time bomb," Gasser said from Zurich in a telephone interview. "If a bank takes those bonds and thinks they're genuine, they won't know until the bonds mature - 15, 20 years, that long." He said Keats' legacy will keep the international financial community unnerved for years.

**SINGLEG* In an affidavit filed in U.S. District Court in September, Leonard Sloane reiterated the confession he made when he began to cooperate with the investigation in June 1982. He described the deals that led to Keats' downfall:

In January 1982, six months before Sloane began to cooperate with the investigation, FBI agents Vaules and Melvin urged Sloane to obtain more paper for Builders Casualty. Sloane reached out for Richard Keats.

They met in New York that month. Keats said he had counterfeit bonds "for rent" in London. On Jan. 19, 1982, Sloane flew from Philadelphia to London, where he met Keats the next day at the Eccleston Hotel, not far from Buckingham Palace. Keats gave him $2.5 million worth of counterfeit Connecticut and New York state bonds.

Their next meeting took place in a slightly less glamorous setting: the Marriott Hotel on City Avenue in Bala Cynwyd. There, in March 1982, Keats gave Sloane a box with $3 million in bogus bonds he had smuggled from London through Canada into the United States. Sloane gave the undercover agents $500,000 worth of paper from that shipment - 20 counterfeited Commonwealth of Massachusetts bond anticipation notes, each with a face value of $25,000.

How did Keats, an international fugitive wanted by three nations, flit in and out of Philadelphia and the United States undetected? Rohn, the prosecutor, said the FBI agents did not know that Keats was Sloane's contact. All they knew was that Sloane's friend was named "Ritchie" and had a seemingly limitless source of paper.

In June 1982, Vaules confronted Sloane with the reality of his crimes. Sloane's confessions spurred a federal grand jury in Philadelphia to return a sealed indictment against Keats on Dec. 21, 1982, charging him with importing $5,573,000 in counterfeit bonds.

The indictment was unsealed May 18, 1983 - the day Keats was arrested by FBI agents, Spanish police and members of the London fraud squad as he stepped off an airplane in Malaga, Spain. Today, Keats is jailed in Zurich, fighting the efforts of federal prosecutors to extradite him to Philadelphia, awaiting trial on charges that could keep him imprisoned in Switzerland for up to 15 years.

**SINGLEG* Sloane next betrayed his old confederate, David Najohn.

In July 1982, Sloane introduced Najohn to undercover FBI agent Frank Kenney at the Fairmont Hotel in San Francisco. They talked about obtaining stolen municipal bonds, Italian treasury notes and phony certificates of deposit for Builders Casualty.

Two weeks later, Najohn flew to Philadelphia and met with Kenney at an office the FBI had rented at the Valley Forge Executive Mall in Wayne. From the wiretapped office, Najohn telephoned a paper bank he controlled in Vaduz, Liechtenstein, to arrange the sale and delivery of 10 bogus certificates of deposit, each with a face value of $250,000, to Builders Casualty.

He was tape-recorded in the transactions and arrested. He, too, began to cooperate with the investigation, but had second thoughts and fled the country. He was arrested in Switzerland in December 1982, extradited, convicted and sentenced to a four-year prison term in U.S. District Court in Philadelphia in June 1983.

Finally, last year, Sloane received a two-year prison sentence for transporting $12 million worth of his Guatemalan paper from Philadelphia to Florida.

**SINGLEG* By October 1982, a year after Gallstone came into being, the first part of the investigation was drawing to a close - in large part because Goepfert began serving time in Allenwood. His 10-year prison sentence was cut to five years after Rohn explained Goepfert's role in Gallstone to the judge who had imposed the sentence.

In October 1983, the prosecutor told U.S. District Judge Whitman Knapp in New York that the investigation had "prevented an economic loss in excess of $400 million" by taking reams of bogus paper out of circulation.

"Obviously other people besides Mr. Goepfert worked on this," the judge said, "but if it wasn't for Mr. Goepfert this whole panorama of activity could not have happened?"

"Yes sir," Rohn said. ". . . Mr. Goepfert continues to cooperate and provide us with information from prison. His cooperation, in the government's view . . . has been extremely significant."

At Allenwood, Goepfert was reunited with **Alex Feinman**, his old partner and co-defendant in the Casualty & Indemnity case. From inside the minimum- security federal prison camp, the nation's best-known prison for white- collar criminals, Goepfert and **Feinman** became two of the FBI's best snitches. They helped develop cases that led to 13 more indictments.

As the investigation grew, two prosecutors were needed to handle the information generated by the FBI. Rohn was joined by Robert Welsh, chief of the major crimes division of the U.S. attorney's office in Philadelphia.

Inside Allenwood, Goepfert befriended a convicted counterfeiter of checks named Frederick Jaeger. Goepfert suggested that Jaeger could make big money when he got out of prison by looking up the people at Builders Casualty.

"We caught him dirty four days out of Allenwood," Welsh said.

"We gave him the frozen tundra speech," said Rohn.

The frozen tundra speech goes something like this, Rohn said: "It's a wasteland out there - you better come in from the cold. . . . There's limited seating on the good-guy train - what are you going to do?"

The speech was chillingly convincing. Jaeger seized the opportunity to cooperate, Rohn said. As a result, five more men were caught in the investigation's spreading net last year.

First, Jaeger brought Jim Vaules, the FBI agent, together with Harry Wu of Hong Kong, an international businessman with a master's degree and a background in the black market, and Frank Avianca of Los Angeles, a production consultant for sex-and-slash movies.

In the spring of 1984, Wu, Avianca and a go-between named Joseph Lofaso delivered $30,000 in stolen American Express travelers' checks to Vaules at 30th Street Station. They offered the undercover agent millions more.

"Avianca told Vaules that there were millions of dollars to be moved through the Far East," wrote U.S. District Judge Raymond J. Broderick, who convicted Wu at a nonjury trial in October. "In Wu's presence, Avianca told Vaules that Wu could guarantee Vaules $100,000 worth of stolen travelers' checks per month" at a price of 40 cents on the dollar. The evidence showed that the travelers' checks had been stolen in Los Angeles and found their way into the black market in Taiwan and thence to the FBI.

But Wu and Aviana had more to offer.

"They offered us, on tape, millions of dollars in phony certificates of deposit, too," Welsh said. "Then there was the phony art - they actually brought down some Matisses and Miros and Picassos and we had them checked out at the Art Museum and they were phony. We probably could have gotten a lot more from those guys, but we didn't have the money - I mean, we didn't want to spend five million dollars."

Avianca, who pleaded guilty, was sentenced to one year in federal prison in December. Lofaso, who also pleaded, received five years' probation, as did Wu.

Jaeger also fed two other former confederates into the FBI's machinery - Marvin Koch and Peter Swenson, who owned a printing company in Hackensack, N.J., and specialized in creating phony financial instruments.

Koch and Swenson received a legitimate $10,000 certificate of deposit from the agents and, using it as a model, proceeded to counterfeit 105 $100,000 CDs from it, Welsh said. Then they made the mistake of crossing a state line.

Koch and Swenson crossed the Delaware to deliver their paper to the undercover agents at a restaurant in New Hope, Bucks County. The second they touched Pennsylvania soil, they had committed a federal offense - interstate transportation of counterfeit securities.

In addition to the $10.5 million in counterfeit Philadelphia National Bank certificates of deposit, Welsh said, "Swenson delivered a batch of blank treasurer's and cashier's checks designed to resemble substantial financial institutions', but slightly different - such as Citibank of Grand Cayman Island, or Bankers Trust of Tortuga." Koch and Swenson pleaded guilty and received probationary terms last year in federal court in Philadelphia.

As if not to let Goepfert outdo him in his cooperation, **Alex Feinman** dealt with two guards at Allenwood. Jack Winter and Melvin Fields were indicted in U.S. District Court in Harrisburg in August 1984 on charges of taking bribes from inmates in exchange for favors. Winter was convicted; Fields is awaiting trial.

Finally, Goepfert helped develop the case against two former state representatives, Charles Caputo and Leonard Martino, who were indicted yesterday on charges of perjury and obstruction of justice. The two former politicians, both lawyers, are charged with lying to a federal grand jury in Philadelphia about their dealings with Goepfert and Vaules - specifically, lying about their requests to Vaules and Goepfert that they provide money to bribe state officials in an effort to obtain state licensing for a shady California insurance company, and denying that they had made corrupt arrangements with two congressmen for a furlough from Allenwood for Goepfert.

The undercover agents remained under wraps. They did not appear at yesterday's news conference. Goepfert and **Feinman**, too, were conspicuous by their absence. But Rohn and Welsh squinted into the television lights and tried to explain the case, going back to 1979 and their first understanding of how Goepfert, **Feinman** and the world of paper scams operated.

A new understanding of that world is the investigation's legacy. But Luther Weaver, the former prosecutor who, along with Rohn, helped bring Goepfert and **Feinman** into the underworld of Gallstone, said his old understanding of the nature of white-collar criminals remained unchanged.

"They never really lose if they get caught," Weaver said. "That's part of the game. They're out of commission for a while, and then they set up somewhere else. They never stop. It's a way of life for them. These guys are very intelligent. They may lose a battle or two, but they live to scheme another scam. A prosecutor who pursures people like that almost never really wins the war."

**Illustration:** PHOTO (2)< 1 - 2. THESE ARE EXAMPLES of counterfeit bonds seized in the sting code-named Gallstone. It was run through Builders Casualty & Surety Ltd., a front company created by the FBI.



---

Copyright (c) 1985 The Philadelphia Inquirer

## Philadelphia Daily News (PA)

April 24, 1985
**Section:** LOCAL
**Edition:** 8STAR
**Page:** 5

## CON-SCIOUS DECISION: FEDS SIDESTEP THE ENTRAPMENT TRAP
### *RON GOLDWYN and GARY THOMPSON, Daily News Staff Writers*

No more Mel Weinbergs. Not if they can help it.

That was how federal prosecutors and FBI agents handled Operation Gallstone, a far-reaching undercover insurance-fraud investigation terminated yesterday after the latest round of indictments in Philadelphia.

Weinberg was the convicted con man who played a key role in Abscam, the controversial and highly successful sting operation that sent a U.S. senator, six congressmen and three Philadelphia city councilmen to jail for corruption and bribery.

The boasting, wisecracking, jewelry-flaunting Weinberg was the middleman who introduced many of the Abscam defendants to federal undercover agents.

Although videotaped bribery transactions led to a string of convictions, Weinberg's frequent off-camera contacts with defendants raised serious legal questions about entrapment and possible criminal activity on the part of the government.

Gallstone - fancifully named for the medcial problems of an FBI supervisor - had its own convicted con man, John V. "Jack" Goepfert, of Monmouth County, N.J. Goepfert set up a phony insurance company in Philadelphia and "capitalized" it with fake securities.

He and a partner even paid off an E.F. Hutton executive and a certified public accountant to vouch for the bogus securities.

Undercover agents used Goepfert to introduce them to other dealers in phony securities - but that was all, said First Assistant U.S. Attorney James J. Rohn.

"We cut him out and dealt directly with the targets," Rohn said.

U.S. Attorney Edward S.G. Dennis Jr. explained that meant no unrecorded conversations or other gaps in the evidence that would leave room for "theories a defendant might weave."

"The main thing was to cut out the middleman," Dennis said. "Those of us who worked in undercover operations are very much aware of the problems of an entrapment defense.

"Abscam heightened our awareness of how dangerous (to the government) an entrapment defense can be. It can endanger an otherwise successful operation."

The FBI decided to create its undercover insurance company operation in 1980, after breaking up Goepfert's fraudulent firm, Casualty and Indemnity, which had offices on Walnut Street in Center City.

C&I sold performance bonds to construction companies. With no financial resources to back the bonds, the company bought forged or stolen securities to inflate its asset base.

The FBI eventually convicted four principals behind C&I for taking advance fees totaling $363,000 for six performance bonds. But Rohn said the bureau realized that as long as phony securities were readily available, the problem of worthless performance bonds would recur.

So the FBI established its own insurance company in a Philadelphia suburb - Rohn declined to name it or say where - and appeared to operate much as C&I had. Undercover agents represented the company as a branch of a large Caribbean insurance firm interested in purchasing phony securities.

That's where the FBI recruited Goepfert and his C&I partner, **Alex Feinman**, both serving federal prison sentences, to introduce them to international con men in the business of selling fake securities.

Undercover agents eventually netted fake securities with a potential value of $500 million. The potpourri included certificates of deposit issued by fictitious banks in Hong Kong and Liechtenstein, and counterfeit municipal bonds from New York counties and Massachusetts health authorities. Most of the certificates were blank, but several had been filled out to represent a total of $17 million.

Unlike C&I, the FBI company never collected money from construction companies looking to buy performance bonds, but stuck to securities dealings.

"After awhile, we got to be pretty well-known con men in our own right," Rohn said.

The trail of underworld characters and contacts led onto some byways. Gallstone indictments included cases involving a stolen car and a proposed $5.8-million marijuana deal.

Federal officials yesterday said they were shutting down the sting following indictment of two

former Pennsylvania legislators on perjury charges related to influence peddling.

The man they thought they were trying to help, through overtures to state officials and congressmen, was Jack Goepfert.

<u>Affidavit Exhibit D</u>

Arrest Warrant

```
CJIS 511868  10/26/03 1920 000.
--------------------FEINMAN,ALEX-------------------- - W6154616--------------
        Commonwealth of Massachusetts - Criminal Justice Information System
              Trial Court of Massachusetts - Warrant Management System
Pursuant to Massachusetts General Laws ch.276 s.23A this is a TRUE WARRANT on
the person named herein as contained in the Warrant Management System and
printed via Criminal Justice Information System.
This Warrant Printed as of 19:20 on 10/26/03
------------------------------------------------------------------------------
Defendant Information:
      Name: FEINMAN,ALEX                          SSN: 205366302
      Address: 1267 NO MAIN ST                    Race: W      Sex: M
                                                  Hair: XXX    Eyes: XXX
      City: ACUSHNET              MA 02743        Weight:      Height: 5'11"
                                                  Complexion:  Marks:
      Date of Birth: 07/19/1949 Place of Birth: MA Date of Emancipation: 00/00/0000
      Father:                            Mother:
      Known Alias:                            Ref No: W6154616

      License No: S53641874                      Misc No:
License State: MA        Obtn No:                CC No:
------------------------------------------------------------------------------
Warrant Information:                              Docket: 0333CR006600
   Issue Date: 10/24/2003  Court of Issue: 33  - NEW BEDFORD DISTRICT
      Type: S - STRAIGHT                                    142201
   Date of Complaint: 10/24/2003
      Offense Date: 04/09/2003  Offense Location: ACUSHNET


   ***************************** Charges ****************************
   Count   Offense Code            Description
     1  F  266/37C/D     CREDIT CARD, IMPROPER USE OVER $250 c266 S37
     1  F  266/37C/A     CREDIT CARD FRAUD OVER $250 c266 S37C
     1  F  266/30/A      LARCENY OVER $250 c266 S30

------------------------------------------------------------------------------
Court Information: NOT TO APPEAR UNLESS ARRESTED
Assigned for Service To: ACU - ACUSHNET PD
Warrant printed by:      ACU - ACUSHNET PD
                                              Fine Amount:
Officer Name:                                 Bail Amount:
Judge's Name: SABRA,BERNADETTE L.             None set
Return Date/Time: 00/00/0000 00:00    Recall Date/Time: 00/00/0000 00:00
------------------------------------------------------------------------------
                  * * * Return of Service on Page 2 * * *




--------------------FEINMAN,ALEX-------------------- - W6154616--------------PAGE 2
        Commonwealth of Massachusetts - Criminal Justice Information System
              Trial Court of Massachusetts - Warrant Management System
Pursuant to Massachusetts General Laws ch.276 s.23A this is a TRUE WARRANT on
the person named herein as contained in the Warrant Management System and
printed via Criminal Justice Information System.

TO ANY OFFICER AUTHORIZED TO SERVE CRIMINAL PROCESS:

         The court has ordered that the above warrant issue against the
         above defendant.

         Therefore you are hereby commanded to arrest the above named
         defendant and bring the defendant forthwith before this court
         to answer to the offense(s) listed above and to be dealt with
         according to law.
------------------------------------------------------------------------------
Return of Service: By virtue of this warrant, I certify that:

      ___ The defendant has been arrested as ordered by the court.
      ___ I am returning the warrant without service to the court.
```

10-26-2003   Dennigh R. Ali   Detective   Acushnet

Date of Arrest  Signature of Person  Title of Person  Department
                  Making Service       Making Service  If different

<u>Affidavit Exhibit E</u>

Police Investigative Report

On Wednesday, May 27, 2003 I spoke with Bill Tessier of the GAP corporate security department. He wanted to report fraudulent charges made in Acushnet on a GAP corporate credit card. Tessier explained that on April 9, 2003, six (6) charges for $500. each were made on a corporate JP Morgan Chase MasterCard (acct# 5478990000103816) belonging belonging to GAP executive Sherri McInnis. The transactions were made at the Parting Ways Texaco Service Station, 121 Main St, Acushnet. The charges posted on the account on 4/11/03.

On Thursday, May 28, 2003, I spoke with George Pimental, owner of the Parting Ways Texaco Station. I asked about the charges in question. Mr Pimental recalled the transactions involved L. Feinman and Sons maintenance and repair business based out of 1267 Main St, Acushnet. Mr Pimental stated that the business owed him over $3000. for fueling their vehicles. On 4/9/2003, Mr Pimental spoke with an L. Feinman and Sons employee he knows only as Stephanie to settle up the outstanding bill. Stephanie gave Mr Pimental the credit card number over the telephone and told him to charge $3000. to the account. Mr Pimental asked about the card number. Stephanie told him that the card number belonged to a vendor who had authorized L. Feinman and Sons to use the card. She said that owner Alex Feinman authorized the transaction because the vendor owed the business money. She added that the vendor was aware the transaction was taking place. Mr Pimental then put through the transactions in question.

I later spoke with Bill Tessier of the GAP corp. He confirmed that his company had retained L. Feinman and Sons to due work . The credit card number in question was supplied by the card holder, Sherri McInnis, to L. Feinman and Sons for payment for $730.80 of work performed in the GAP's Wrentham, MA store. Tessier assured me that McInnis had not authorized the $3000. transaction in Acushnet nor the approximately other $2700. in transactions made elsewhere in the state.

On June 11, 2003, I made contact with Stephanie Palmer of L. Feinman and Sons. She was the person Mr Pimental conducted the transactions in question with. She agreed to meet me at the Acushnet Police Station when she got out of work at 5PM. At approximately 1:30PM, I was notified that Ms Palmer *and* Alex Feinman were in the station to speak with me.

I first spoke with Ms Palmer. She confirmed that she had given Mr Pimental the credit card number from the GAP at Alex Feinman's direction. Ms Palmer stated that the GAP Inc owes L. Feinman and Sons in excess of $6000. for services performed throughout stores from New  Jersey to Massachusetts. The $3000. in transactions put through Parting Ways Texaco Station in Acushnet on 4/9/03 was an attempt to collect what the GAP owes L Feinman and Sons and also to pay down the amount L. Feinman and Sons owed the Texaco station for fuel. Ms Palmer added that GAP executive Sherri McInnis was well aware of these transactions and was forwarded invoices indicating same.

I then spoke with Mr Feinman at his request. He provided me with numerous copies of invoices, small claims court proceedings, and other documents claiming the GAP Inc owed L. Feinman and Sons nearly $12,000. He confirmed that he had received the GAP credit card number to use as payment for the job done in the Wrentham store. Since he had no way to charge the GAP credit card account on behalf of his business, the credit card number was used to make a $730.80 payment on an L. Feinman and Sons bill at Lloyd's Market in Rochester. The $3000. in charges at the Texaco station and the additional $2000. in charges made elsewhere were an attempt to collect on money the GAP Inc. owes L Feinman and Sons for work performed in other stores owned by GAP Inc . Mr Feinman added that he has conducted similar transactions with credit card

numbers provided to him from the Burger King corporation.

On Wednesday, 6/24/03, at approximately 12PM, I met with Sherri McInniss, Regional Assistant with GAP Inc at their regional office in Waltham, MA. Ms McInniss confirmed that L. Feinman and Sons had installed a high pressure toilet at a cost of $730.80 in the GAP outlet store in Wrentham in March 2003. Shortly there after, representatives from L. Feinman and Sons began calling the regional office and pressing for payment. Ms McInniss stated they were informed numerous times that payment for subcontractor services was handled out of the corporate office. After numerous telephone calls, Ms McInniss provided her corporate MasterCard number to Feinman and Sons to pay the $730.80 Wrentham bill. When Ms. Mcinniss received her MasterCard statement at the end of May 2003, no charges for L. Feinman and Sons were listed. There were charges listed for $730.80 at Lloyd's Market in Rochester made on 4/8/03, six (6) $500. charges at Texaco Inc in Acushnet on 4/9/03, and a $2000. charge at Boston Equipment on 4/11/03 in Salem.

Ms McInniss maintains that at no time did she authorize Alex Feinman or anyone from L. Feinman and Sons to charge any more that the $730.80 for the Wrentham job.

On 10/21/03, after a conversation with ADA Chris Markey, I contacted Bill Tessier of the GAP corp. Mr. Tessier stated that he and the GAP were still interested in pursuing criminal charges against Mr Feinman.

Alex Feinman has a lengthy criminal history involving similar offenses. He has previously walked away from a federal lockup and has used numerous aliases upon arrest in the past. He has strong roots in the New Jersey and Philadelphia, Pennsylvania areas. Additionally, Alex Feinman and the L. Feinman & Sons business have been the sources of numerous similar borderline criminal complaints totaling tens of thousands of dollars over the past six months. Activity in and around their Acushnet office has decreased dramatically.

Based on the above, I request a warrant be issued for the arrest of Alex Feinman for the aforementioned charges.

Respectfully,

Detective Christopher R. Richmond
Acushnet Police

```
11/28/2003                    ACUSHNET  POLICE  DEPARTMENT                    Page: 1
Ref: 03-361-OF          NARRATIVE FOR DETECTIVE CHRISTOPHER R RICHMOND
```

On Sunday, October 26, 2003 at approximately 7:17PM, I was assigned to uniform patrol in a marked cruiser. In the area of Main Street and Lantern Lane, I observed a male known to me as Alex Feinman walking his dog east on Lantern Lane. Having prior knowledge of the existence of an arrest warrant for Mr Feinman, I stopped and approached him.

I informed Mr Feinman of the warrant and the charges it involved. I accompanied him back to his house where he secured his dog. I allowed Mr Feinman to speak with his wife and make a telephone call to his attorney Donald Barnes. I then escorted Mr Feinman out of his house where I was met by Officers Louann Jenkinson and John Preston. I pat frisked Mr Feinman, handcuffed him (double locking the cuffs), and attempted to have him sit in the rear of my cruiser. Mr Feinman had some difficulty due to hip problems so I had him sit in the front passenger's seat instead. He was then seatbelted in and transported  to the station.

Once at the station, Mr Feinman's property was inventoried. The inventory included a black leather wallet, $524. in cash (5-100's, 2-10's, 4-1's), $.47 in change (1-Q, 2-D, 2-P), a Nokia cell phone w/case, and a pair of eyeglasses. I spoke briefly with Mr Feinman regarding the charges against him. Mr Feinman exercised his right to a telephone call to call his wife.

Per his prior request, ADA Chris Markey was notified of the arrest. He instructed me to send down Feinman's federal criminal record as well as a bail request for $3000 when Feinman was transported to the Ash Street Regional Lockup. Once the booking process was complete, Officer Preston transported Mr Feinman to the Regional Lockup (again belted in the front seat) to await a bail hearing.


Respectfully Submitted,

Chris Richmond
Detective
Acushnet Police

```
           ACUSHNET POLICE DEPARTMENT                    Page: 1
                  Summons Report                       11/28/200
```

```
                  Summons #: 03-294-AR
          Related Arrest #:
                     Call #: 03-2523
                 Incident #: 03-168-OF
```

---

```
Date/Time Reported: 05/28/2003 @ 1522
  Arrest Date/Time: 10/23/2003 @ 1430
              OBTN: TACU200300294
     Refer To Cases: 03-168-OF
 Reporting Officer: Detective Christopher Richmond
 Approving Officer: Detective Christopher Richmond
          Signature: _____
```

---

| # | DEFENDANT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | FEINMAN, ALEX<br>1267 MAIN ST<br>ACUSHNET MA 02743 | M | W | 54 | 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 | 508-763-3357 |

```
        HEIGHT: 511    WEIGHT: 195          HAIR: NOT AVAIL.      EYES: BROWN
          BODY: NOT AVAIL.             COMPLEXION: NOT AVAIL.
           DOB: 07/19/1949         PLACE OF BIRTH: PENNSYLVANIA
 LICENSE NUMBER: MA S53641874          ETHNICITY: NOT HISPANIC
```

_____[APPEARANCE]_____

```
          GLASSES WORN: NO
```

| ALIAS LAST NAME | FIRST NAME | MIDDLE NAME | SSN | DOB |
|---|---|---|---|---|
| DAVIS | CALVIN | YORK | NOT AVAIL | NOT AVAIL |
| FEIN | ALEX | | NOT AVAIL | NOT AVAIL |
| FERMISNAN | ALEX | | NOT AVAIL | NOT AVAIL |
| FEIMAN | ALEX | | NOT AVAIL | NOT AVAIL |
| FEINSTEIN | AL | | NOT AVAIL | NOT AVAIL |
| FEINMAN | ALEXANDER | | NOT AVAIL | NOT AVAIL |

_____[FAMILY/EMPLOYMENT INFORMATION]_____

```
       MARITAL STATUS: MARRIED
```

---

| # | OFFENSE(S) | A/C | CHAPTER | SECTION |
|---|---|---|---|---|
| | LOCATION TYPE:  Service/Gas Station        Zone: CENTER ZONE<br>PARTING WAYS SERVICE STATION INC.<br>121 MAIN ST<br>ACUSHNET MA 02743 | | | |
| 1 | CREDIT CARD, IMPROPER USE OVER $250<br>OCCURRED: 04/09/2003    1200 | C | 266 | 37C |
| 2 | CREDIT CARD FRAUD OVER $250<br>OCCURRED: 04/09/2003    1200 | C | 266 | 37C |
| 3 | LARCENY OVER $250<br>OCCURRED: 04/09/2003    1200 | C | 266 | 30 - FALSE |

**ACUSHNET POLICE DEPARTMENT**            Page: 2
Summons Report                    11/28/200

Summons #: 03-294-AR
Related Arrest #:
Call #: 03-2523
Incident #: 03-168-OF

| # | VICTIM(S) | | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 1 | GAP INC.<br>1601 TRAPELO RD<br>WALTHAM MA 02451<br>VICTIM CONNECTED TO OFFENSE NUMBER(S): 1   2   3 | | | | | NOT AVAIL | |
| 2 | J P MORGAN CHASE<br>3949 SOUTH 700 EAST #500<br>SALT LAKE CITY UT 84107<br>VICTIM CONNECTED TO OFFENSE NUMBER(S): 1   2   3 | | | | | NOT AVAIL | 801-590-1401 |

| # | PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 1 | TESSIER, WILLIAM<br>1601 TRAPELO RD<br>WALTHAM MA 02451<br>DOB: NOT AVAIL<br>EMPLOYER: GAP SECURITY DEPARTMENT   · | REPORTING PARTY | M | U | 99 | NOT AVAIL | 617-794-9345 |
| 2 | MCINNIS, SHERRI<br>1601 TRAPELO RD<br>WALTHAM MA 02451<br>DOB: NOT AVAIL<br>EMPLOYER: GAP INC.   ·   781-839-8700 | WITNESS | F | U | 99 | NOT AVAIL | |
| 4 | PALMER, STEPHANIE I<br>14 FRANKLIN ST<br>NEW BEDFORD MA 02740<br>DOB: 10/08/1976<br>EMPLOYER: L. FEINMAN & SONS   · | PARTICIPANT | F | W | 26 | 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 | |
| 5 | ANGUIANO, PATRICIA<br>3949 SOUTH 700 EAST #500<br>SALT LAKE CITY UT 84107<br>DOB: NOT AVAIL<br>EMPLOYER: J P MORGAN CHASE   ·   888-307-2990 | WITNESS | F | U | 99 | NOT AVAIL | 801-590-1401 |

| # | OTHER PROPERTIES | PROPERTY # | STATUS |
|---|---|---|---|
| 1 | MASTERCARD #<br>  QUANTITY: 1            VALUE: $3,000.00<br>  SERIAL #: 5478990000103816<br>    DATE: 05/28/2003<br>   OWNER: GAP INC. | | Stolen |

**ACUSHNET POLICE DEPARTMENT**

Summons Report

```
          Summons #: 03-294-AR
   Related Arrest #:
             Call #: 03-2523
         Incident #: 03-168-OF
```

```
         *******************************
         ***CONFIDENTIAL PERSON REPORT***
         *******************************
```

| # | PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|-----------|-------------|-----|------|-----|-----|-------|
| 3 | PIMENTAL, GEORGE<br>12 MANCHESTER LN<br>ACUSHNET MA 02743 | WITNESS | M | W | 49 | | |

```
            ACUSHNET POLICE DEPARTMENT                  Page: 1
                 Incident Report                        11/28/200:


         Incident #: 03-361-OF
           Call #: 03-5559
```

```
                Date/Time Reported: 10/26/2003 1917
                 Report Date/Time: 10/26/2003 2028
                 Occurred Between: 10/26/2003 1917-10/26/2003 2015
                           Status: Incident Closed
               Reporting Officer: Detective Christopher Richmond
               Approving Officer: Detective Christopher Richmond

                        Signature: _____
```

| # | OFFENSE(S) | A/C | CHAPTER | SECTION |
|---|---|---|---|---|

LOCATION TYPE: Highway/Road/Alley/Street    Zone: NORTH ZONE
LANTERN LN  @ MAIN ST
ACUSHNET MA 02743

| 1 | WARRANT ARREST | C | | |

OCCURRED: 10/26/2003   1917

| # | SUSPECT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | FEINMAN, ALEX | M | W | 54 | 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 | 508-763-3357 |

1267 MAIN ST
ACUSHNET MA 02743

```
        HEIGHT: 511    WEIGHT: 195            HAIR: NOT AVAIL.       EYES: BROWN
          BODY: NOT AVAIL.               COMPLEXION: NOT AVAIL.
           DOB: 07/19/1949            PLACE OF BIRTH: PENNSYLVANIA
  LICENSE NUMBER: MA S53641874            ETHNICITY: NOT HISPANIC
```

_____ [APPEARANCE] _____

GLASSES WORN: NO

| ALIAS LAST NAME | FIRST NAME | MIDDLE NAME | SSN | DOB |
|---|---|---|---|---|
| DAVIS | CALVIN | YORK | NOT AVAIL | NOT AVAIL |
| FEIN | ALEX | | NOT AVAIL | NOT AVAIL |
| FERMISNAN | ALEX | | NOT AVAIL | NOT AVAIL |
| FEIMAN | ALEX | | NOT AVAIL | NOT AVAIL |
| FEINSTEIN | AL | | NOT AVAIL | NOT AVAIL |
| FEINMAN | ALEXANDER | | NOT AVAIL | NOT AVAIL |

_____ [FAMILY/EMPLOYMENT INFORMATION] _____

MARITAL STATUS: MARRIED

Case 1:03-cv-12301-GAO    Document 146-4    Filed 07/20/2006    Page 47 of 47

On Monday, 10/27/03, I spoke with Special Agent Chuck Prunier of the FBI. I forwarded all information I had on Alex Feinman and his business. I also put him in touch with two confidential informants that had significant information regarding Feinman's activities.

On Wednesday, 10/29/03, I spoke with Attorney David Nold. Mr Nold called from Washington state. He represents Universal Funding Corporation of Spokane, Washington. Feinman allegedly defrauded Universal Funding out of $350,000. In April 2003, a Washington State Superior Court Judge found in favor of Universal and awarded them a $500,000. settlement. Feinman has not responded to court orders resulting in the issuance of some sort of civil bench warrant. That warrant dictates that Feinman be held on $20,000 bail and be brought before the Washington court. Universal is willing to pay for extradition. Because this is not a criminal warrant, I put Mr Nold in touch with Lt Floyd Teague of the Bristol County Sheriff's Office Civil Process Division to make arrangements to pick up Feinman.